Argued October 29, affirmed December 17, 1973, petition for
reconsideration denied January 23, petition for review
denied February 20, 1974

AMERICAN CAN COMPANY ET AL, *Appellants, v.*
OREGON LIQUOR CONTROL COMMISSION
ET AL, *Respondents,* NORTHWESTERN
GLASS COMPANY ET AL,
*Intervenors-Appellants.*
517 P2d 691

*George L. Wagner,* Portland, argued the cause for appellants. With him on the briefs were Dezendorf, Spears, Lubersky & Campbell, Portland; and Chadwell, Kayser, Ruggles, McGee, Hastings & McKinney, and C. Lee Cook, Jr., Chicago, Illinois.

*Philip B. Kurland,* Chicago, Illinois, argued the cause for intervenors-appellants. With him on the briefs were Miller, Anderson, Nash, Yerke & Wiener, and Fredric A. Yerke, Jr., Portland; Fuller, Henry, Hodge & Snyder, Fred E. Fuller and William W. Sadd, Toledo, Ohio; Alexander M. Bickel, New Haven, Connecticut; and Gerald Gunther, Stanford, California.

*Lee Johnson,* Attorney General, Salem, argued the cause for respondents. With him on the brief were John W. Osburn, Solicitor General, and John B. Leahy, Assistant Attorney General, Salem.

*John E. Bryson,* Palo Alto, California; Thomas C. Grey, Portola Valley, California; and William N.

Gross and Anderson, Hall, Lowthian & Gross, Portland, filed a brief for Natural Resources Defense Council, Inc., and People's Lobby Against Non-Returnables as amici curiae.

*Hans A. Linde,* Eugene, filed a brief for Oregon Environmental Council as amicus curiae.

Before SCHWAB, Chief Judge, and FORT and TANZER, Judges.

TANZER, J.

This is an appeal from a circuit court decree declaring that Oregon's so-called bottle bill, ORS 459.810-459.890, is valid and denying plaintiffs' and intervenors' application for injunctive relief against the enforcement of the law. Plaintiffs are (a) manufacturers of cans who supply the beer and soft drink industries, (b) brewers who brew and package beer in California and Arizona which is shipped to and sold in Oregon, (c) out-of-state soft drink canners who can soft drinks for Oregon bottlers for resale here, (d) soft drink companies who market their products in Oregon, and (e) the Oregon Soft Drink Association. Intervenors are five glass container manufacturers who supply the beer and soft drink industries. (The term "plaintiffs" will be used in this opinion to include intervenors unless it is specified otherwise.) The defendants include (as parties responsible for administering the statute) the Oregon Liquor Control Commission, its commissioners and administrator, the State Department of Agriculture and its director, and the State of Oregon.

The bottle bill, enacted by the Oregon legislature

in 1971, became effective on October 1, 1972. The statute's principal provisions are as follows:

1. Every retailer of the covered beverages (beer or carbonated beverages) in Oregon is required to "accept from a consumer any empty beverage containers of the kind, common size and brand sold by the dealer" and to pay the consumer the statutory "refund value" of the container. ORS 459.830 (1). The "refund value" is required to be indicated on every beverage container "sold or offered for sale in this state by the dealer." ORS 459.850.

2. A distributor must similarly accept empty containers from a dealer for the "refund value." ORS 459.830 (2). A distributor is defined as a person, including a manufacturer, "who engages in the sale of beverages in beverage containers to a dealer in this state." ORS 459.810 (6).

3. Metal beverage containers, a part of which is wholly detachable in opening without a can opener ("pull top" cans), may not be sold at retail in Oregon. ORS 459.850 (3).

4. A reduced "refund value" may be administratively set for a beverage container which is acceptable to more than one manufacturer for re-use in the ordinary course of business. ORS 459.860. This reduced "refund value" has been set in the amount of two cents for such "certified" containers. ORS 459.820 (2).

The primary legislative purpose of the bottle bill is to cause bottlers of carbonated soft drinks and brewers to package their products for distribution in Oregon in returnable, multiple-use deposit bottles toward the goals of reducing litter and solid waste in Oregon and

reducing the injuries to people and animals due to discarded "pull tops."

As bases for attacking the validity of the statute, plaintiffs invoke the Equal Protection[1] and Due Process[2] Clauses of the Fourteenth Amendment to the United States Constitution, and the Commerce Clause, Article I, § 8, clause 3, of the United States Constitution.[3] In addition, plaintiffs cite various provisions of the Oregon Constitution.[4]

One of plaintiffs' main objectives at trial was to show that the bottle bill would have an effect not only upon manufacturers of bottles and cans, but also upon an entire distribution chain including brewers, soft drink bottlers and canners, beer wholesalers, retailers and, ultimately, consumers. The evidence in this regard demonstrated that the consumption of malt beverages and soft drinks had increased greatly in the United

---

[1]

"* * * nor [shall any State] deny to any person within its jurisdiction the equal protection of the laws."

[2]

"* * * nor shall any State deprive any person of life, liberty, or property, without due process of law * * *."

[3]

"The Congress shall have Power * * * To regulate Commerce with foreign Nations, and among the several States * * *."

[4] Plaintiffs and intervenors rely upon a number of provisions of the Oregon Constitution in support of their position:

Art. 1, § 10, guarantees every person "remedy by due course of law for injury done him in his person, property, or reputation."

Art. 1, § 18, provides that "[p]rivate property shall not be taken for public use * * * without just compensation * * *."

Art. 1, § 20, forbids any law "granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens."

States in recent years, and that a large part of this increase could be attributed to the use of convenient "one-way" packages, including both cans and non-returnable bottles. Plaintiffs assert that non-returnable containers are essential to the existence of national and regional beer markets, and that non-returnable containers are also essential to the continued existence of soft drink enterprises. The non-returnable containers were shown to have provided economies in the packaging and distribution of soft drinks and beer by eliminating the cost of shipping the containers both ways, thus causing an increase in feasible shipping distances and enlarging the market each manufacturer could cover. Among the effects of the bottle bill, plaintiffs' witnesses predicted, would be a substantial reduction in Oregon sales of soft drinks packaged outside Oregon, and impairment of the ability of distant brewers to compete in the Oregon market. The bottle bill would necessitate substantial changes in the structure of the industries involved in the manufacturing and merchandising of beer and soft drinks.

Substantial portions of plaintiffs' evidence was directed to the extent of the bottle bill's economic impact upon the specific individual industries represented by the plaintiffs. Summarized, this evidence (which was uncontradicted) predicted the following impact upon the various industries:

1. Spokesmen of the three plaintiff soft drink canners testified that each of their companies would be hurt by the bottle bill because the statute would substantially eliminate soft drink cans from the Oregon market. One witness, the president of an Oregon canning company, predicted that the statute would put his company out of business. Representa-

tives of the two out-of-state companies, while not predicting complete ruin, predicted that they would suffer substantial economic loss.

2. Representatives of the plaintiff metal container companies testified that beer and soft drink containers represented a substantial percentage of their total metal container production (in the case of one firm, the percentage was 100 percent), and that the Oregon market was a significant outlet for their products. Some of the companies would be forced to eliminate portions of their operations because of the statute, it was predicted, and each of the representatives stated the opinion that nationwide enactment of laws similar to the bottle bill would severely damage his business. In addition, the can companies' spokesmen testified that the bottle bill's ban on pull tops would hurt that aspect of their businesses, too.

3. It was predicted that, because of the changes in the structure of the industries which would be mandated by the bottle bill, the Oregon sales of the plaintiff brewers would be reduced and that the price of beer would have to rise when the statute went into effect. Similarly, because of the changes which would be necessary in the soft drink industry, it was predicted that the size and growth of the Oregon soft drink market would be substantially reduced.

4. Representatives of intervenor glass companies (which are capable of manufacturing both returnable and non-returnable bottles) testified that they will lose a substantial volume of sales because the bottle bill encourages multiple use of each bottle. Each time a bottle is refilled, plaintiffs will

have lost a potential sale of a new bottle. The evidence indicated that the extent of loss due to the Oregon statute would be significant, and if such statutes should be passed in other states, the effect would be multiplied.

Finally, evidence was introduced by plaintiffs which was designed to (a) minimize the predicted effectiveness of the bottle bill toward the statute's purposes of elimination of litter and reduction of glass and metal refuse in the solid waste stream; (b) contend that a merchandising system utilizing solely returnable containers is unworkable, and that consumers would not support it; and (c) point out alternative means of attacking these problems. In this regard, plaintiffs presented evidence that the containers regulated by the bottle bill constitute a relatively small percentage of litter and solid waste, and expert testimony from a behavioral scientist who testified that the provision of refund values on beverage containers will not substantially modify littering behavior. In addition, plaintiffs presented evidence of the activities of various civic organizations designed to alleviate the litter and solid waste problems, and the establishment in various places around the nation of resource recovery systems. It was contended that these were viable alternatives to the solution inherent in the bottle bill.

## COMMERCE CLAUSE

Plaintiffs' most substantial challenge to the bottle bill is under the Commerce Clause of the United States Constitution.

The development of the one-way container provided a great technological opportunity for the beverage industry to turn logistical advantages into

economic advantages. By obviating the expensive necessity of reshipping empty bottles back to the plant for refilling, the new containers enabled manufacturers to produce in a few centralized plants to serve more distant markets. The industry organized its manufacturing and distribution systems to capitalize maximally on the new technology.

The Oregon legislature was persuaded that the economic benefit to the beverage industry brought with it deleterious consequences to the environment and additional cost to the public. The aggravation of the problems of litter in public places and solid waste disposal and the attendant economic and esthetic burden to the public outweighed the narrower economic benefit to the industry. Thus the legislature enacted the bottle bill over the articulate opposition of the industries represented by plaintiffs.

As with every change of circumstances in the market place, there are gainers and there are losers. Just as there were gainers and losers, with plaintiffs apparently among the gainers, when the industry adapted to the development of non-returnable containers, there will be new gainers and losers as they adapt to the ban. The economic losses complained of by plaintiffs in this case are essentially the consequences of readjustment of the beverage manufacturing and distribution systems to the older technology in order to compete in the Oregon market.

■■ The purpose of the Commerce Clause, following the intolerable experience of the economic Balkanization of America which existed in the colonial period and under the Articles of Confederation, was to assure to the commercial enterprises in every state substantial

equality of access to a free national market. It was not meant to usurp the police power of the states which was reserved under the Tenth Amendment. Therefore, although most exercises of the police power affect interstate commerce to some degree, not every such exercise is invalid under the Commerce Clause.

Plaintiffs acknowledge the authority of the state to act, but assert that the state exercise of its police power must yield to federal authority over interstate commerce because, they claim, the impact on interstate commerce in this case outweighs the putative benefit to the state and because alternative methods exist to achieve the state goal with a less deleterious impact on interstate commerce. They urge us to assume the role of a "super legislature," as they put it, and perform for ourselves the weighing process already performed by the Legislative Assembly, relying largely upon *Pike v. Bruce Church, Inc.,* 397 US 137, 142, 90 S Ct 844, 25 L Ed 2d 174 (1970), which states:

> "Although the criteria for determining the validity of state statutes affecting interstate commerce have been variously stated, the general rule that emerges can be phrased as follows: Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. *Huron Cement Co. v. Detroit,* 362 US 440, 443. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities. * * *"

■ The language of the United States Supreme

Court is not always consistent in analyzing the application of the Commerce Clause to varying facts and it is difficult to rationalize it into one harmonious jurisprudential whole. On their facts, however, the cases cluster around certain basic concepts and the treatment accorded to state action is consistent within each grouping. The cases consistently hold that the Commerce Clause bars state police action only where:

    (1) federal action has pre-empted regulation of the activity;

    (2) the state action impedes the free physical flow of commerce from one state to another; or

    (3) protectionist state action, even though under the guise of police power, discriminates against interstate commerce.

In this case there is no claim of federal pre-emption, so we are concerned only with the latter two concepts, interstate transportation and economic protectionism. No party cited and we were unable to find any case striking down state action under the Commerce Clause which did not come within one of these two categories.

The language of *Pike v. Bruce Church, Inc.,* supra, does not mechanically compel a weighing process in every case. The language is instructive in appropriate cases rather than mandatory in all cases. The blight of the landscape, the appropriation of lands for solid waste disposal, and the injury to children's feet caused by pull tops discarded in the sands of our ocean shores are concerns not divisible by the same units of measurement as is economic loss to elements of the beverage industry and we are unable to weigh them, one against the other. The United States Supreme Court recognized the inappropriateness of a weighing

process in cases of non-comparable benefit and injury when it chastised the District Court for having done so in *Firemen v. Chicago, R. I. & P. R. Co.*, 393 US 129, 89 S Ct 323, 21 L Ed 2d 289 (1968):

> "We think it plain that in striking down the full-crew laws on this [weighing] basis, the District Court indulged in a legislative judgment wholly beyond its limited authority to review state legislation under the Commerce Clause. * * *" 393 US at 136.

> "* * * The District Court's responsibility for making 'findings of fact' certainly does not authorize it to resolve conflicts in the evidence against the legislature's conclusion or even to reject the legislative judgment on the basis that without convincing statistics in the record to support it, the legislative viewpoint constitutes nothing more than what the District Court in this case said was 'pure speculation.' " 393 US at 138-39.

The court has weighed comparables such as the relative effectiveness of safety measures in transportation cases, *see*, e.g., *Bibb v. Navajo Freight Lines,* 359 US 520, 79 S Ct 962, 3 L Ed 2d 1003 (1959), and *Southern Pacific Co. v. Arizona,* 325 US 761, 65 S Ct 1515, 89 L Ed 1915 (1945), or health inspection cases, *Dean Milk Co. v. Madison,* 340 US 349, 71 S Ct 295, 95 L Ed 329 (1951), *Minnesota v. Barber,* 136 US 313, 10 S Ct 862, 34 L Ed 455 (1890), or economic benefit and injury in economic discrimination cases such as *Pike v. Bruce Church, Inc.,* supra, but it does not weigh non-comparables such as cost to the railroads against arms and legs of the workers in *Firemen v. Chicago, R. I. & P. R. Co.,* supra, because the result would be wholly subjective. That process becomes political and is constitutionally assigned to the legislative branch as the determiner of policy.

Where the putative state benefit and the impact upon interstate commerce are grossly disproportionate, the disparity is apparent without going through the motions of a judicial weighing process. The question then becomes one of equal protection and we deal with that below.

The bottle bill is unquestionably a legitimate legislative exercise of the police power. The breadth of the police power was noted by the United States Supreme Court in *Berman v. Parker,* 348 US 26, 33, 75 S Ct 98, 99 L Ed 27 (1954):

> "* * * The values [public welfare] represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled. * * *"

Specifically upholding the authority of the states to enact environmental legislation affecting interstate commerce, the court held in *Huron Cement Co. v. Detroit,* 362 US 440, 442, 80 S Ct 813, 4 L Ed 2d 852 (1960):

> "* * * Legislation designed to free from pollution the very air that people breathe clearly falls within the exercise of even the most traditional concept of what is compendiously known as the police power. In the exercise of that power, the states and their instrumentalities may act, in many areas of interstate commerce and maritime activities, concurrently with the federal government. [Citations omitted]"

The United States Supreme Court has also made clear that it will not only recognize the authority of the state to exercise the police power, but also its right to

do so in such manner as it deems most appropriate to local conditions, free from the homogenizing constraints of federal dictation. In *Breard v. Alexandria,* 341 US 622, 640-41, 71 S Ct 920, 95 L Ed 1233 (1951), the court stated:

"* * *

> 'The police power of a state extends beyond health, morals and safety, and comprehends the duty, within constitutional limitations, to protect the well-being and tranquility of a community.'

When there is a reasonable basis for legislation to protect the social, as distinguished from the economic, welfare of a community, it is not for this Court because of the Commerce Clause to deny the exercise locally of the sovereign power of Louisiana. Changing living conditions or variations in the experiences or habits of different communities may well call for different legislative regulations as to methods and manners of doing business. Powers of municipalities are subject to control by the states. Their judgment of local needs is made from a more intimate knowledge of local conditions than that of any other legislative body. * * *" (footnotes omitted).

■ The Oregon legislature is thus constitutionally authorized to enact laws which address the economic, esthetic and environmental consequences of the problems of litter in public places and solid waste disposal which suit the particular conditions of Oregon even though it may, in doing so, affect interstate commerce.

■ The enactment of the bottle bill is clearly a legislative act in harmony with federal law. Congress has directed that the states take primary responsibility for action in this field. By enacting the Federal Solid Waste Disposal Act, 42 USC § 3251 et seq. (1970), Congress specifically recognized that the proliferation of

new packages for consumer products has severely taxed our disposal resources and blighted our landscapes. It disclaimed federal pre-emption and assigned to local government the task of coping with the problem with limited federal fiscal assistance:

"(a) The Congress finds—

"(1) that the continuing technological progress and improvement in methods of manufacture, packaging, and marketing of consumer products has resulted in an ever-mounting increase, and in a change in the characteristics, of the mass of material discarded by the purchaser of such products;

"* * * * *

"(4) that inefficient and improper methods of disposal of solid wastes result in scenic blights, create serious hazards to the public health, including pollution of air and water resources, accident hazards, and increase in rodent and insect vectors of disease, have an adverse effect on land values, create public nuisances, otherwise interfere with community life and development;

"* * * * *

"(6) that while the collection and disposal of solid wastes should continue to be primarily the function of State, regional, and local agencies, the problems of waste disposal as set forth above have become a matter national in scope and in concern and necessitate Federal action through financial and technical assistance and leadership in the development, demonstration, and application of new and improved methods and processes to reduce the amount of waste and unsalvageable materials and to provide for proper and economical solid-waste disposal practices.

"* * * * *"

Congress has recently reaffirmed that allocation of state and federal responsibility by enactment of the

Environmental Quality Improvement Act, 42 USC §
4371 (1970), which provides:

"(b) (1) The Congress declares that there is a
national policy for the environment which provides
for the enhancement of environmental quality. This
policy is evidenced by statutes heretofore enacted
relating to the prevention, abatement, and control
of environmental pollution, water and land re-
sources, transportation, and economic and regional
development.

(2) The primary responsibility for implementing
this policy rests with State and local governments.
"* * * * *"

*See also,* the Federal Water Pollution Act, 33 USC §
1151 et seq. (1970). It is significant that the United
States Supreme Court relied upon this legislation in
validating the intrusion upon interstate commerce
caused by the Detroit Smoke Abatement Act in *Huron
Cement Co. v. Detroit,* supra.

While it is clear that the Oregon legislature was
authorized to act in this area, plaintiffs assert that the
means incorporated in the bottle bill are not effective
to accomplish its intended purpose and that alternative
means are available which will have a lesser impact
upon interstate commerce. Particularly, they offered
evidence to show: (1) that the deposit system is in-
adequate to motivate the consuming public to return
containers;[9] (2) that mechanical means are being de-
veloped for improved collection of highway litter; and
(3) that public education, such as the "Pitch In To
Clean Up America" campaign, is a desirable means of
dealing with container litter.

---

[9] *But see* Olympia Brewing Co. v. OLCC, 15 Or App 655, 516
P2d 1321 (1973), in which the evidence showed a remarkably high
return rate of 85 percent on "Tall 12" beer bottles.

■ Selection of a reasonable means to accomplish a state purpose is clearly a legislative, not a judicial, function, to which the admonitive language from *Firemen v. Chicago R. I. & P. R. Co.,* supra, 393 US at 136 and 138-39, quoted above is clearly applicable. In particular, the courts may not invalidate legislation upon the speculation that machines may be developed or because additional and complementary means of accomplishing the same goal may also exist. The legislature may look to its imagination rather than to traditional methods such as those which plaintiffs suggest to develop suitable means of dealing with state problems, even though their methods may be unique. Each state is a laboratory for innovation and experimentation in a healthy federal system. What fails may be abandoned and what succeeds may be emulated by other states. The bottle bill is now unique; it may later be regarded as seminal.

We conclude, therefore, that the bottle bill was properly enacted within the police power of the state of Oregon and that it is imaginatively, but reasonably, calculated to cope with problems of legitimate state concern.

■ Plaintiffs next assert that "Oregon's 'Bottle Bill' would not merely 'impede substantially the free flow of commerce' [*Southern Pacific Co. v. Arizona,* 325 US 761 (1945) at 767] but in many cases totally destroy and eliminate it * * *." The law surrounding the concept of impediments to the flow of interstate commerce relates consistently to the actual instrumentalities of interstate commerce, i.e., railroad, truck, air and other of the actual means of transportation of goods across state lines, not to the goods being transported.

■ The fact that the flow may be impeded is not in

itself enough to invalidate the state law. As the United States Supreme Court stated in *Southern Pacific Co. v. Arizona*, supra, 325 US at 770:

> "* * * There has thus been left to the states wide scope for the regulation of matters of local state concern, even though it in some measure affects the commerce, provided it does not materially restrict the free flow of commerce across state lines, or interfere with it in matters with respect to which uniformity of regulation is of predominant national concern."

If the burden upon interstate commerce is one of actual impediment upon the free physical flow, then the burden will be viewed with great judicial dubiety. Thus, train length is not subject to state regulation because national uniformity is "practically indispensable to the operation of an efficient and economical national railway system," *Southern Pacific Co. v. Arizona*, supra, 325 US at 771, and a state cannot require a unique type of mud flap on trucks in interstate commerce, *Bibb v. Navajo Freight Lines*, 359 US 520, 79 S Ct 962, 3 L Ed 2d 1003 (1959). Even the means of interstate transportation, however, are subject to state police regulation under limited circumstances. For example, a full-crew law to promote safety was authorized in *Firemen v. Chicago R. I. & P. R. Co.*, supra, even though a train may have to stop at state borders to take on or let off crewmen. Similarly, the application of the municipal smoke abatement code to federally inspected and licensed steam vessels engaged in interstate shipping was upheld in *Huron Cement Co. v. Detroit*, 362 US 440, 80 S Ct 813, 4 L Ed 2d 852 (1960).

If the very means of all interstate commerce are subject to the states' reasonable exercise of police

power in the interest of safety or environmental protection, then surely the containers of one class of product in that flow are conferred no immunity from regulation as they cross the state line.

■ Plaintiffs argue persuasively that this case involves more than the transportation of bottles and cans, that it involves an interstate system of distribution for a national industry. Accepting that, the distribution system is still subject to the reasonable exercise of state police power. The United States Supreme Court in *Breard v. Alexandria,* 341 US 622, 71 S Ct 920, 95 L Ed 1233 (1951), upheld an ordinance designed to protect privacy which prohibited door-to-door sales over an argument that the means of distribution of an interstate industry would be rendered illegal in one city. The court held to the contrary:

> "We recognize the importance to publishers of our many periodicals of the house-to-house method of selling by solicitation. As a matter of constitutional law, however, they in their business operations are in no different position so far as the Commerce Clause is concerned than the sellers of other wares. Appellant, as their representative or in his own right as a door-to-door canvasser, is no more free to violate local regulations to protect privacy than are other solicitors. As we said above, the usual methods of seeking business are left open by the ordinance. That such methods do not produce as much business as house-to-house canvassing is, constitutionally, immaterial and a matter for adjustment at the local level in the absence of federal legislation. * * *" (footnote omitted.) 341 US at 637-38.

Similarly, we are unable to say that the economic burden upon the plaintiffs is sufficient to displace the authority of the State of Oregon to legislate regarding environmental problems.

In summary, the "free flow of commerce" cases are of no help to plaintiffs because they protect only the physical means of interstate transportation from unauthorized intrusion. The protection of the goods in that flow is found in the next cluster of cases, those that bar economic discrimination against interstate commerce.

Plaintiffs seek the benefit of the latter cases by asserting that the bottle bill burdens interstate commerce by economic discrimination against out-of-state interests. If that were indeed the design of the legislature,® then the burden would likely be intolerable, despite a claim of lofty purpose under the police power.

---

® Plaintiffs base their claim of intentional economic protectionism on a statement of Attorney General Lee Johnson in his testimony before a legislative committee that the bottle bill would result in more jobs for Oregonians because Oregon producers would have a competitive advantage. They quote the statement out of context. The Attorney General was not asserting competitive advantage as a reason for the legislation. Rather, he was merely answering the anticipated argument from the bill's opponents that the legislation would cost Oregon business sales and jobs. The paragraph of his testimony, with the portion quoted by plaintiffs emphasized, reads as follows:

"We recognize that this bill will face heavy sledding in the Oregon Legislature. In the State of Washington a citizens' group tried to pass a similar bill by way of referendum. Powerful vested interests, particularly large national bottle and can manufacturers, mounted a well-financed campaign and defeated the measure. These same vested interests, most of whom are not located in the State of Oregon, will be mounting the same campaign here. They will contend that the bill will increase the price of soft drinks and beer, but I believe that this is simply not true. Any price increase should be offset by the refund. They will also contend that the bill will destroy Oregon businesses and lead to a loss of jobs. This likewise is not true. Many small bottle distributors in Oregon who are now being forced out of business will be able to survive and provide new jobs. Many Oregon concerns will indeed be given a competitive advantage over outside firms who have inadequate distribution facilities to handle re-cycled bottles."

The United States Supreme Court has invalidated milk quota preferences for in-state milk, *Baldwin v. G.A.F. Seelig,* 294 US 511, 55 S Ct 497, 79 L Ed 1032 (1935), *Polar Co. v. Andrews,* 375 US 361, 84 S Ct 378, 11 L Ed 2d 389 (1964), preferential inspection laws which inhibit non-state distributors, *Minnesota v. Barber,* 136 US 313, 10 S Ct 862, 34 L Ed 455 (1890), *Dean Milk Co. v. Madison,* 340 US 349, 71 S Ct 295, 95 L Ed 329 (1951), and, in a recent case relied on heavily by plaintiffs, a requirement that Arizona cantaloupes be packed in Arizona, *Pike v. Bruce Church, Inc.,* 397 US 137, 90 S Ct 844, 25 L Ed 2d 174 (1970), but even there the court carefully limited its weighing process to economic considerations and specifically distinguished safety or consumer protection legislation. The purpose of the legislation in each case was protectionist, despite the invocation of the police power.

■ On the other hand, legislation which has negative economic consequences for non-state business is not necessarily discriminatory against interstate commerce. In particular, the *Pike* case notes and distinguishes *Pacific States Co. v. White,* 296 US 176, 56 S Ct 159, 80 L Ed 138, 101 ALR 853 (1935), in which an Oregon regulation of containers for berries packed in Oregon was upheld despite the diminution of the ability of California box makers to compete with Oregon interests. It also noted the California raisin marketing system which was upheld in *Parker v. Brown,* 317 US 341, 63 S Ct 307, 87 L Ed 315 (1943), although the express design of that law was to give the California raisin industry an economic tactical advantage.

Lower courts have recently upheld the state's authority to ban products altogether from the state's market for legitimate state police purposes as against

Commerce Clause claims. A New York law prohibiting sale of products made from the skins of endangered species, none of which are indigenous to New York, was upheld in *Palladio, Inc. v. Diamond,* 321 F Supp 630 (SDNY 1970), aff'd 440 F2d 1319 (2nd Cir 1971), *cert denied* 404 US 983, 92 S Ct 446, 30 L Ed 2d 367 (1971), and labeling restrictions on detergents and a ban on the sale of phosphate detergents was upheld in *Soap and Detergent Association v. Clark,* 330 F Supp 1218 (SD Fla 1971), although not in *Soap and Detergent Association v. City of Chicago,* 357 F Supp 44 (ND Ill 1973).

On a claim of economic discrimination and relevant also to the equal protection claim below, it is appropriate to look to the nature of the economic burden upon interstate commerce and the legislative motivation in creating that burden. A gross disparity would tend to evidence police power coloration to an act of economic protectionism. Plaintiffs offered evidence, much of it necessarily speculative, as to severe economic effects upon their elements of the beverage industry. Their evidence that the public would purchase and consume substantially less beer and carbonated beverages by virtue of the bottle bill is not persuasive. We are not dealing with a large loss of sales across the industry, but rather with the ability of various elements of the industry to obtain a share of the consumers' dollars. As we noted above, the introduction of any new circumstance affecting competition will cause economic winners and economic losers throughout the industry as it readjusts to that new circumstance. The evidence is that plaintiffs expect to be among the losers, unless, of course, they are able to make marketing adjustments.

Economic loss restricted to certain elements of

the beverage industry must be viewed in relation to the broader loss to the general public of the state of Oregon which the legislature sought, by enactment of the bottle bill, to avoid. The availability of land and revenues for solid waste disposal, the cost of litter collection on our highways and in our public parks, the depletion of mineral and energy resources, the injuries to humans and animals caused by discarded pull tops, and the esthetic blight on our landscape, are all economic, safety and esthetic burdens of great consequence which must be borne by every member of the public. The legislature attached higher significance to the cost to the public than they did to the cost to the beverage industry and we have no cause to disturb that legislative determination.

The bottle bill is not discriminatory against interstate commerce and is not intended to operate to give Oregon industry a competitive advantage against outside firms. The ban on pull tops and the deposit-and-return provisions apply equally to all distributors and manufacturers whether Oregon-based or from out of state. According to plaintiffs' testimony, the economic burden of the industry's adjustment to the change will be shared by Oregon businesses as well as non-Oregon businesses. Indeed, the chairman of the board of Oregon's only brewery testified that it would be hurt by compliance more than its out-of-state competitors. A canning firm from Eugene, Oregon would be among the canners suffering the greatest economic loss. In other words, the evidence is clear that the cost of adjustment to the new exigencies of selling beverages in Oregon will be spread throughout the beverage industry, its suppliers, manufacturers and distributors without regard to whether they are Oregon-based firms.

Plaintiffs assert particularly that the reduction

in the refund value of standardized containers from five cents to two cents each operates to discriminate against out-of-state manufacturers. They argue that they cannot produce the container for two cents and that an Oregon producer enjoys a competitive advantage by being able to buy the out-of-state producer's bottles at the lower cost and without the additional expense of shipping them to a distant plant. In effect, they claim, distant shippers must sell bottles to Oregon firms at below cost.

We do not agree that the device of a reduced refund for standardized containers is discriminatory against out-of-state interests. The purpose of the provision is clearly to provide an incentive to make bottles as fungible as possible in order to ease the burden upon the distribution system by eliminating the need for sorting, facilitating industry-wide redemption and obviating the cost of reshipment. The firm which attempts to compete at a great distance from its market suffers a natural disadvantage, whatever container is allowed. Just as use of the non-returnable container reduced the inherent disadvantage of a distant competitor, the refund provisions tend to partially restore the former degree of disadvantage. The disadvantage does not relate to the state borders. A bottler in southern Oregon, for example, would be at a disadvantage competing to recapture used bottles in the Portland market relative to a competing bottler from Vancouver, Washington. The competitive disadvantage is one of distance, not one of state boundaries. *See Olympia Brewing Co. v. OLCC,* 15 Or App 655, 516 P2d 1321 (1973). While the state is under an obligation not to discriminate against out-of-state business interests, it is under no obligation to maintain equal levels of com-

petitive advantage for all producers regardless of their distance from the market. We hold that the refund provisions of the bottle bill neither operate nor are designed to operate as devices of protectionism for Oregon interests or discrimination against non-Oregon interests.

■ Because the bottle bill is a legitimate exercise of the police power, consistent with federal policy legislation, which does not impede the flow of interstate commerce and which does not discriminate against non-Oregon interests, we hold that it is valid legislation under the Commerce Clause. We turn now to plaintiffs' other constitutional challenges.

## DUE PROCESS

■ Plaintiffs argue that the bottle bill is violative of the Due Process Clause of the Fourteenth Amendment and assert that this court must weigh the legislative purpose against the degree of oppression to individuals. We made such a general comparison above in the section dealing with cases of purported economic discrimination under the Commerce Clause and we saw no cause to disturb the legislative judgment. The United States Supreme Court has not struck down economic legislation on the basis of substantive due process since the Depression. In one of the more recent attempts to invoke the doctrine, *Firemen v. Chicago R. I. & P. R. Co.,* supra, 393 US at 143, the court dismissed the challenge without discussion. *See also, Ferguson v. Skrupa,* 372 US 726, 83 S Ct 1028, 10 L Ed 2d 93, 95 ALR2d 1347 (1963).

## EQUAL PROTECTION

Plaintiffs argue that the bottle bill is violative of the Equal Protection Clause as applied to them.

They argue that they have an affirmative right to engage in interstate commerce analogous to the rights of freedom from discrimination based upon race, religion or sex and the right to engage in travel. They claim that we must examine any intrusion upon that right with the same "strict scrutiny" as we would examine those personal rights. They argue that the bottle bill must fail because its goals do not justify its burdens upon the plaintiffs, and because it will not tend to accomplish its goals in that it applies only to beer and soft drink containers and not to other containers which are equally deleterious to the environment.

■ We do not accept the plaintiffs' attempted analogy with cases involving invidious discrimination based upon race or religion or based on fundamental affirmative individual rights such as the right to travel or the right to free speech. The Commerce Clause does not purport to grant a personal right. Rather, it is an allocation of power between the levels of government in the federal system. Plaintiffs are entitled to equal protection from arbitrary state interference into the conduct of their business by arbitrary classification.

The United States Supreme Court stated the general principle in *McGowan v. Maryland,* 366 US 420, 425-26, 81 S Ct 1101, 6 L Ed 2d 393 (1961):

> "* * * [T]he Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the

fact that, in practice, their laws result in some inequality. * * *"

■ We find that the bottle bill in all of its aspects is reasonably calculated to achieve legitimate state objectives under the police power as discussed above. The ban on pull tops is reasonably calculated to diminish the injuries to people who step on them and to animals who eat them at pasture as well as to reduce the litter which they create. The placing of a monetary value on beverage containers and its attendant encouragement for people to return them instead of discarding them by the roadside or in other public places or throwing them into the garbage is reasonably calculated to diminish the amount of solid waste and the amount of litter with which the state is required to deal. *See Anchor Hocking v. Barber,* 118 Vt 206, 105 A2d 271 (1954).

The fact that other containers may also create litter and solid waste does not invalidate the legislature's intent to deal with this species of solid waste and litter. As the United States Supreme Court said in *Railway Express v. New York,* 336 US 106, 110, 69 S Ct 463, 93 L Ed 533 (1949), "It is no requirement of equal protection that all evils of the same genus be eradicated or none at all." The court further held in *Williamson v. Lee Optical Co.,* 348 US 483, 489, 75 S Ct 461, 99 L Ed 563 (1955):

"* * * Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. The legislature may select one phase of one field and apply a remedy there, neglecting the others. * * *" (citations omitted.)

Plaintiffs' right to equal protection has not been abridged.

## THE OREGON CONSTITUTION

Plaintiffs made claims under three sections of the Oregon Constitution.

■ First, they invoke article 1, section 10, "* * * Every man shall have remedy by due course of law for injury done him in his person, property or reputation." Section 10 concerns the administration of justice. The quoted words were historically directed against denying a remedy for a legal injury to the named private interests recognized under the law of torts or property. *Cf. Holden v. Pioneer Broadcasting Co. et al,* 228 Or 405, 365 P2d 845 (1961), *dismissed* 370 US 157 (1962). It is not to be considered the equivalent of the Due Process Clause of the Fourteenth Amendment. *See* Linde, *Without Due Process,* 49 Or L Rev 125, 136-38 (1970).

■ Plaintiffs also invoke article 1, section 18 as it provides that "private property shall not be taken for public use * * * without just compensation." This section was designed to provide compensation and money damages where the government takes property for governmental use. *See Cereghino et al v. State Highway Com.,* 230 Or 439, 370 P2d 694 (1962); *Thornburg v. Port of Portland,* 233 Or 178, 376 P2d 100 (1962). It does not authorize the invalidation of state law merely because of negative economic consequences to a given industry.

■ Plaintiffs next cite article 1, section 20, which states that "[n]o law shall be passed granting to any citizen or class of citizens, privileges, or immunities,

which, upon the same terms, shall not equally belong to all citizens." Section 20 is not the equivalent of the Equal Protection Clause, the latter being adopted several years after the adoption of section 20. It was essentially a bar to the legislature against singling out specific individuals or interests for preferential treatment on an ad hominem basis. There is no such claim in this case.

The Oregon constitutional provisions are not appropriate to the challenges raised by plaintiff in this case.

## THE TWENTY-FIRST AMENDMENT

The Attorney General claims that the bottle bill is constitutional as it applies to beer containers under the Twenty-First Amendment.[7] We doubt that the authority of the state to control the sale and use of liquor extends to regulation of the containers in interstate commerce for the purpose of abating litter and solid waste problems. Because we have sustained the bottle bill on other grounds and because even a ruling favorable to the defendants under the Twenty-First Amendment would not be dispositive of the bottle bill as it applies to the soft drink industry, we need not and do not reach the issues under the Twenty-First Amendment.

---

[7] "Section 1. The eighteenth article of amendment to the Constitution of the United States is hereby repealed.

"Sec. 2. The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited.

"Sec. 3. This article shall be inoperative unless it shall have been ratified as an amendment to the Constitution by conventions in the several States, as provided in the Constitution, within seven years from the date of the submission hereof to the States by the Congress."

Plaintiffs' and intervenors' constitutional challenges having failed, we hold the bottle bill to be a valid exercise of Oregon's police power. In doing so, we acknowledge having had the benefit of an able analysis by the trial court.

Affirmed.