[No. 47087–1. En Banc. February 11, 1981.]

GEORGE WHITAKER, ET AL, *Respondents,* v.
SPIEGEL, INC., *Appellant.*

*George, Hull & Porter, P.S.,* by *T. Dennis George* and *Laurie D. Kohli,* for appellant.

*Richard B. Price* and *Smith, Brucker, Winn & Ehlert,* by *Thomas H. S. Brucker,* for respondents.

*Slade Gorton, Attorney General, Thomas L. Boeder, Senior Assistant,* and *Jon P. Ferguson, Assistant,* amici curiae for respondents.

WILLIAMS, J.—This case presents the question whether appellant Spiegel, Inc., a corporation which is in the business of selling goods by mail throughout the United States, may charge Washington customers a service charge rate of 19.8 percent per year (1.65 percent per month) on retail purchases made under a revolving charge agreement. The trial court concluded that the 19.8 percent rate violated provisions of several Washington statutes, and entered summary judgment for respondents George and Margaret Whitaker.

The findings of fact, which are not substantially disputed, disclose the following:

Appellant is a Delaware corporation with its principal offices in Chicago, Illinois. Appellant is engaged nationwide in the mail order merchandising of retail consumer goods and products and solicits business in all 50 states. Although appellant has no offices in Washington, it has specifically solicited business from Washington residents on a continual basis by (1) mailings to Washington residents of merchandise catalogs and flier mailings addressed to specific persons; (2) advertising materials placed in monthly billing statements directed to Washington customers; and (3) in 1974 and 1975, newspaper advertisements.

The result of appellant's active solicitation of retail business from Washington residents has been the successful development of accounts receivable business. In 1974, appellant had an average of 31,048 Washington credit accounts and generated outstanding balances of $6,247,109. In 1975, there were on the average 26,070 credit customers from whom appellant generated $5,568,836, and in 1976, there were on the average 20,787 customers from whom appellant generated $4,594,524.

Washington residents fill out a printed standard order form prepared by appellant and mail it to appellant in Illinois. The order form provides, among other things, that the

Washington resident promises "to pay according to the contract terms set forth in your current catalogue". The printed order form also specifies that "all credit orders must be for $10.00, or more, and are subject to Spiegel credit approval". It further provides that if the customer orders additional merchandise after his or her initial order and has an unpaid balance in connection with such previous orders, any new orders are to be "added to the existing balance as one account." Until June 1976, appellant charged a time–price differential service charge of 19.8 percent, a rate which is permissible under the law of Illinois. After June 1976, appellant reduced the rate to Washington customers to 12 percent.[1] Appellant's service charge rate was and is disclosed in its catalog.

Upon receipt of an order form from a Washington resident, appellant attempts to verify the credit rating for the Washington resident by, among other means, use of credit bureaus located in the state of Washington. After verifying credit, appellant fills the order and the goods are mailed to the Washington resident at his or her address. The goods may come from a warehouse located in Illinois, or the goods may be shipped directly from their places of manufacture, which are located throughout the United States. Appellant then directs bills from Illinois to Washington customers and receives payment from the customers through the mail.

In the course of its business dealings with Washington residents, appellant keeps track of delinquent accounts. This task is accomplished in part with the aid of collection agencies located in the state of Washington. However, although appellant sends the delinquent accounts to Washington collection agencies, the accounts are maintained in appellant's name and are not assigned to the collection agencies. The collection agencies handle the accounts "on Spiegel's behalf." To the extent the collection agencies are

---

[1]Respondents do not dispute appellant's statement that it has accepted no *new* applications for charge accounts from Washington residents since lowering its service charge rate to 12 percent.

not successful, appellant seeks and relies upon the benefit of the Washington courts when it seeks legal recourse against delinquent debtors.

On behalf of themselves and all other credit customers of Spiegel who reside in Washington, respondents brought an action against appellant in November of 1976, claiming that appellant's 19.8 percent service charge rate violated RCW 63.14, the Washington retail installment sales act (RISA); RCW 19.52, the Washington usury act; RCW 19.86, the Washington Consumer Protection Act; and Const. art. 12, § 7.

In October 1978, appellant moved for a summary judgment of dismissal on the grounds that Washington law was inapplicable and that in the alternative, if Washington law was deemed applicable, the result violated the commerce clause, U.S. Const. art. 1, § 8, as it was an undue burden on and discriminated against interstate commerce. The trial court denied the motion, ruling that (a) Washington law was applicable, (b) appellant's charge agreement violated RISA and the usury act, (c) appellant did not violate the Consumer Protection Act, (d) the question of whether appellant's conduct violated Const. art. 12, § 7 was moot, and (e) application of these laws did not constitute an undue burden on or discriminate against interstate commerce. The matter of class certification remains, pending resolution of this matter. We granted review pursuant to a motion to transfer from Division Three of the Court of Appeals.

This is not a case in which the law chosen by the parties to govern their rights is in doubt. *See Baffin Land Corp. v. Monticello Motor Inn, Inc.,* 70 Wn.2d 893, 899, 425 P.2d 623 (1967); *Potlatch No. 1 Fed. Credit Union v. Kennedy,* 76 Wn.2d 806, 459 P.2d 32 (1969); Restatement (Second) of Conflict of Laws § 188 (1971). Appellant's order form contains the following language in the clause above the signature line:

I promise to pay according to the contract terms set forth in your current catalog and I understand the contract is

to be governed by Illinois law . . .

Clerk's Papers, at 508.

■ Generally, parties to a contract may determine the specific terms of the agreement, but the contract provisions are subject to limitation and invalidation if they contravene public policy. *Mutual of Enumclaw Ins. Co. v. Wiscomb,* 95 Wn.2d 373, 622 P.2d 1234 (1981); *Giambattista v. National Bank of Commerce,* 21 Wn. App. 723, 735, 586 P.2d 1180 (1978); *see* R. Weintraub, *Conflict of Laws* § 7.3C (2d ed. 1980).

The Washington usury statute provides that 12 percent is the maximum rate that may be exacted "for the loan or forbearance of any money". RCW 19.52.020. RCW 19.52-.005 declares that the policy of the state, as expressed by the legislature, is

> to protect the residents of this state from debts bearing burdensome interest rates; and in order to better effect the policy of this state to use this state's policies and courts to govern the affairs of our residents and the state; and in recognition of the duty to protect our citizens from oppression generally.

Indeed, our legislature views this policy as so fundamental as to include a choice of law provision extending the territorial application of the usury law to out–of–state contracts:

> Whenever a loan or forbearance is made outside Washington state to a person then residing in this state the usury laws found in chapter 19.52 RCW, as now or hereafter amended, shall be applicable in all courts of this state to the same extent such usury laws would be applicable if the loan or forbearance was made in this state.

RCW 19.52.034.

■ The legislative mandate is clear: In an interstate loan transaction, the Washington courts are not free to engage in conflict of law analysis to determine whether or not the parties' own choice of law provision should apply. Rather, the legislature has directed that, in an action brought in Washington on an allegedly usurious transac-

tion, Washington's usury law will apply if the debtor was a resident of Washington at the time the loan was made, even if the loan was made outside the state. *See generally* R. Weintraub, *supra* at 389–94; A. Ehrenzweig, *Conflict of Laws* 485–86 (1962); Leflar, *Choice–Influencing Considerations in Conflicts Law,* 41 N.Y.U. L. Rev. 267, 271–79 (1966); Comment, *Usury in the Conflict of Laws: The Doctrine of the Lex Debitoris,* 55 Cal. L. Rev. 123, 197–98 (1967). It follows that Washington's usury law, RCW 19.52, applies to the present transaction.

Appellant contends, however, that according to our old decision in *Hafer v. Spaeth,* 22 Wn.2d 378, 156 P.2d 408 (1945), the service charge on its revolving charge accounts cannot be subject to the usury law. In *Hafer,* we defined usury as consisting of the following elements:

(1) a loan or forbearance, express or implied; (2) money or its equivalent constituting the subject matter of the loan or forbearance; (3) an understanding between the parties that the principal shall be repayable absolutely; (4) the exaction of something in excess of what is allowed by law for the use of the money loaned or for the benefit of the forbearance; and, in some jurisdictions, (5) an intent to exact more than the legal maximum for the loan or forbearance.

*Hafer,* at 382–83.

In *Hafer,* the court held that conditional installment sales do not constitute a "loan or forbearance" and therefore do not meet all requisite elements of usury. *Hafer,* at 384–87. Appellant urges that *Hafer* disposes of the present case, in that the revolving charge accounts at issue here involve the same kind of deferred credit, and thus may not be defined as usury.

We have, however, questioned the continuing soundness of *Hafer.* In *National Bank of Commerce v. Thomsen,* 80 Wn.2d 406, 495 P.2d 332 (1972), we characterized an agreement between the purchaser of a car, the car dealer, and the National Bank of Commerce as a loan between the bank and the purchaser, and not as a conditional sales contract. Thus described, the transaction was held to be cov-

ered by the usury act. Although neither affirming nor over-ruling *Hafer,* we recognized that there was "respectable authority" for the proposition that a conditional sales agreement constitutes a loan or forbearance, and we left open, therefore, the possibility of a reconsideration of *Hafer* at some later date.

> If it is true that persons who purchase on installment terms automobiles and other items of merchandise which they feel they need are under economic pressure as severe as that which influences borrowers of money to accept oppressive terms, then there is no logical reason to make a distinction between the exacting of excessive charges for deferring payments and the exacting of such charges for loaning money.

*National Bank of Commerce,* at 411.

■ In *Hafer,* at page 384, we defined forbearance as

> a contractual obligation of a lender *or creditor* to refrain, during a given period of time, from requiring the bor-rower *or debtor* to pay a loan *or debt* then due and pay-able.

(Italics ours.) We also stated that "the courts will [always] look through the form of the transaction and consider its substance." *Hafer,* at 383. *See also State v. J.C. Penney Co.,* 48 Wis. 2d 125, 179 N.W.2d 641 (1970).

■ Appellant argues that its service charge is a time-price differential, in which the service charge is merely the difference between the cash price and the installment price. We disagree. Essentially, a time–price agreement depends on the presentation of two prices to the purchaser: a cash price and a time–sale price. *J.C. Penney Co.,* at 148–49; *Wood v. Commonwealth Trailer Sales, Inc.,* 172 Neb. 494, 499, 110 N.W.2d 87 (1961). Under appellant's arrangement, the customer is not presented with two set prices, but rather is shown a cash price and a credit price consisting of the cash price coupled with a service charge percentage which remains constant against a fluctuating debt. The service charge is not a fixed amount independent of the amount owed, but rather is a percentage of a balance of indebtedness and is computed monthly upon the unpaid

balance. This credit charge varies because even though the service charge rate remains constant, it is applied to a potentially increasing or decreasing balance. In a sense, each customer controls his or her own credit charge, for each has the ability to choose when to pay the entire obligation, thereby eliminating the service charge. Thus, in any revolving charge account with appellant, there are not two set prices, and therefore it is not truly a time–price differential. *J.C. Penney Co.*, at 141–50.

■ We think appellant's revolving charge account constitutes a forbearance. The relationship between the respondents and appellant is clearly that of debtor and creditor. Respondents are indebted to appellant upon delivery of the goods and acceptance of them. Appellant, by its credit agreement, has agreed to refrain from immediately requiring respondents or any other debtors to pay their debts. In return, respondents have agreed to pay a constant service charge percentage which is applied against a changeable balance. Such an arrangement has been described as follows:

> Where a time sale price is determined by applying a certain schedule of rates or charges to the cash price, the resulting product is interest. This is merely a sale for a cash price, with the difference between the money the buyer has and what he needs being financed.

*Lloyd v. Gutgsell,* 175 Neb. 775, 782, 124 N.W.2d 198 (1963).

We are persuaded that the time is ripe to overrule *Hafer*; as the trial court noted, the view that usury laws do not apply to installment contracts has been subjected to much criticism. Warren, *Regulation of Finance Charges in Retail Instalment Sales,* 68 Yale L.J. 839, 843 (1959):

> Today, the belief that one borrows money from need but purchases on credit by choice is manifestly anachronistic. . . . If the usury laws were designed to protect weak and needy persons from the overreaching of economically superior renters of capital, then it should be recognized that the bargaining position of instalment

buyers may be as disadvantageous as that of borrowers of money.

*See also* Bernstein, *Background of a Gray Area in Law: The Checkered Career of Usury,* 51 A.B.A.J. 846 (1965).

Moreover, this court itself expressed doubt as to *Hafer's* continuing validity in *National Bank of Commerce v. Thomsen, supra.* Accordingly, we hereby overrule *Hafer v. Spaeth, supra,* and hold that credit sales involving revolving charge accounts constitute a forbearance within the meaning of the usury statute. In so holding, we join a growing number of states. *See State v. J.C. Penney Co., supra; Sloan v. Sears, Roebuck & Co.,* 228 Ark. 464, 308 S.W.2d 802 (1957); *Lloyd v. Gutgsell, supra; Rollinger v. J.C. Penney Co.,* 86 S.D. 154, 192 N.W.2d 699 (1971); *State ex rel. Turner v. Younker Bros., Inc.,* 210 N.W.2d 550 (Iowa 1973); *State ex rel. Meierhenry v. Spiegel, Inc.,* ___ S.D. ___, 277 N.W.2d 298, *appeal dismissed,* 444 U.S. 804, 62 L. Ed. 2d 17, 100 S. Ct. 25 (1979). *See also* Annot., *Validity and Construction of Revolving Charge Account Contract or Plan,* 41 A.L.R.3d 682 (1972); Annot., *Advance in Price for Credit Sale as Compared With Cash Sale as Usury,* 14 A.L.R.3d 1065, 1128–43 (1967). *Contra, Johnson v. Sears, Roebuck & Co.,* 14 Ill. App. 3d 838, 303 N.E.2d 627 (1973); *Standard Oil Co. v. Williams,* 153 Ind. App. 489, 288 N.E.2d 170 (1972); *Overbeck v. Sears, Roebuck & Co.,* 169 Ind. App. 501, 349 N.E.2d 286 (1976); *Sliger v. R.H. Macy & Co.,* 59 N.J. 465, 283 A.2d 904 (1971); *Dennis v. Sears, Roebuck & Co.,* 223 Tenn. 415, 446 S.W.2d 260 (1969); *see generally* 14 A.L.R.3d, *supra.*

In addition to the forbearance, does the present contract meet the other requirements for usury? Clearly, the forbearance is for money or its equivalent, which is the second element of usury. *Hafer,* at 382–83. As to the third element, it is evident from the agreement that the parties agreed that the principal should be repaid absolutely. Fourth, the 19.8 percent interest rate is clearly in excess of what is permissible under our usury law. RCW 19.52.020. Finally, as to the fifth element, there is no argument that appellant did

not intend to exact the rate of 19.8 percent, which is more than the legal maximum allowed under our usury law.[2]

The trial court found that appellant's mail order charge agreements were subject to RISA. The act applies to two types of retail installment transactions: retail installment contracts and retail charge agreements. A retail installment contract is defined as

a contract, other than a retail charge agreement or an instrument reflecting a sale made pursuant thereto, entered into or performed in this state for a retail installment transaction.

RCW 63.14.010(6).

A retail charge agreement is defined as

an agreement entered into or performed in this state prescribing the terms of retail installment transactions which may be made thereunder from time to time and under the terms of which a service charge, as defined in this section, is to be computed in relation to the buyer's unpaid balance from time to time;

RCW 63.14.010(7). The maximum service charge which can be charged under either type of retail installment transaction is 12 percent per annum, or 1 percent per month. RCW 63.14.130.

Appellant argues that RISA is inapplicable since mail order charge agreements are not specifically mentioned in the statute whereas mail order installment contracts are specifically mentioned. RCW 63.14.060. According to appellant, this indicates that the legislature intended to exclude mail order charge agreements from the entire act.

■ This argument is unpersuasive. Mail order installment contracts are mentioned only in RCW 63.14.060, which exempts retail installment contracts based on catalog or other printed solicitations from the disclosure requirements for retail installment contracts mandated in RCW

---

[2]This conclusion is strengthened by Spiegel's admission at oral argument that it does not use an Illinois choice–of–law provision in agreements with customers who reside in states which permit service and interest charge rates closer to 19.8 percent.

63.14.040. Retail charge agreements, by contrast, are subject to the different disclosure requirements of RCW 63.14-.120. It does not follow, however, that exempting mail order retail installment contracts from the installment contract reporting requirements must mean that the legislature intended to exclude mail order charge agreements from the coverage of the act.

█ A second reason for rejecting this argument is that such an interpretation may run contrary to the purpose of RISA. In 1968, the voters of the state of Washington passed Initiative 245 (Laws of 1969, ch. 2), which limited the service charge on retail installment transactions to 12 percent per year. Thus, although RISA does not contain a declaration of policy among its provisions, the court in determining the spirit and intent of the act may look to the material in the official voters' pamphlet which contained the text and an explanation of the proposed statute. *Department of Revenue v. Hoppe,* 82 Wn.2d 549, 512 P.2d 1094 (1973); *Bayha v. PUD 1,* 2 Wn.2d 85, 89, 97 P.2d 614 (1939).

The statement for Initiative 245 in the Official Voters Pamphlet of 1968 reads, in part, at page 8:

> Retail stores are charging 18% interest per year on "revolving charge accounts." . . . That's why Initiative 245 was filed. It rolls the rates back to 12%!

The explanatory comment to Initiative 245, issued by the Attorney General, states:

> The proposed act would reduce the maximum amount which may be legally assessed as a service charge in connection with retail installment transactions from 18% per year to 12% per year computed monthly on the unpaid balance . . .

Official Voters Pamphlet 9 (1968).

█ The purpose of RCW 63.14.130 is thus clear: It is to prevent the rate of interest charged on revolving charge accounts from exceeding 12 percent. To exclude mail order charge agreements from RISA's coverage, as appellant suggests, would defeat this purpose in a substantial number of cases.

■ Appellant argues in addition that RCW 63.14.010(6) requires that a retail charge agreement be entered into or performed in Washington to make it subject to the act. Appellant contends that the contract was entered into in Illinois since each order form is subject to its credit approval. But the performance of the contract for the purpose of RISA takes place in Washington at the time the customer accepts the goods, determines to keep them, and posts payment through a mail receptacle located here.[3]

Accordingly, we conclude that appellant's mail order charge agreements are subject to RISA. By exacting a 19.8 percent service charge from its Washington customers, appellant is clearly in violation of RISA. RCW 63.14.130.

The trial court also held that appellant's conduct did not violate the Consumer Protection Act, because there was no showing of unfair or deceptive trade practices as required by RCW 19.86.020. *Anhold v. Daniels,* 94 Wn.2d 40, 614 P.2d 184 (1980). It is not necessary, however, for us to decide whether appellant has engaged in a deceptive trade practice, since the usury act expressly declares that the Consumer Protection Act is violated by the entry into a usurious contract:

> Entering into or transacting a usurious contract is hereby declared to be an unfair act or practice in the conduct of commerce for the purpose of the application of the consumer protection act found in chapter 19.86 RCW.

RCW 19.52.036.

The legislature has clearly expressed the policy that the protection of the consuming public is enhanced by permitting application of the Consumer Protection Act in those situations where consumers are faced with usurious con-

---

[3]Spiegel cites *Lawyers Coop. Publishing Co. v. Kuntz,* 73 Wn.2d 674, 440 P.2d 813 (1968), as authority for its contention that the retail charge agreement is performed outside Washington. That case addressed the question whether a mail order publishing business was required to pay a corporate license fee to the State of Washington as a condition of maintaining a legal action in the Washington courts. The extent of the publisher's activities here, not the location of the parties' performance of the agreement, was the focus of the court's inquiry.

tracts. Since we have found the present contract to fall under the usury statute, we therefore hold the Consumer Protection Act is likewise applicable.

Appellant next contends that application of RISA and the usury statute both imposes an impermissible burden on interstate commerce and discriminates against out-of-state mail order businesses, therefore contravening the commerce clause of the United States Constitution. U.S. Const. art. 1, § 8.

The purpose of the commerce clause is to prevent the imposition of state policies on those who lack political representation within the state. *See* L. Tribe, *American Constitutional Law* 327 (1978). The framers intended to avoid the "economic Balkanization" of commerce by assuring "to the commercial enterprises in every state substantial equality of access to a free national market. It was not meant to usurp the police power of the states which was reserved under the Tenth Amendment." *American Can Co. v. Oregon Liquor Control Comm'n,* 15 Ore. App. 618, 628–29, 517 P.2d 691 (1973).

Appellant concedes that economic hardship in itself is not sufficient to invalidate as unconstitutional a state regulation affecting interstate commerce. *See American Can Co.,* at 638; *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 57 L. Ed. 2d 91, 98 S. Ct. 2207 (1978). Pointing to evidence in the record that the burden on appellant is "prohibitive", appellant nevertheless urges us to weigh the competing interests, which, it is contended, will show that the economic hardship is entirely unreasonable when balanced against the State's interest in protecting its citizens from usurious contracts.

The judicial weighing of burdens and benefits has ordinarily been undertaken only when there are comparable interests. *See, e.g.,* the transportation cases, *Bibb v. Navajo Freight Lines, Inc.,* 359 U.S. 520, 3 L. Ed. 2d 1003, 79 S. Ct. 962 (1959), and *Southern Pac. Co. v. Arizona ex rel. Sullivan,* 325 U.S. 761, 89 L. Ed. 1915, 65 S. Ct. 1515 (1945); and the health inspection cases, *Dean Milk Co. v. Madison,* 340

U.S. 349, 95 L. Ed. 329, 71 S. Ct. 295 (1951); *Minnesota v. Barber,* 136 U.S. 313, 34 L. Ed. 455, 10 S. Ct. 862 (1890); *American Can Co.,* at 631. But where the competing interests are not comparable, the judiciary does not engage in a weighing process. *Brotherhood of Locomotive Firemen v. Chicago, R.I. & Pac. R.R.,* 393 U.S. 129, 21 L. Ed. 2d 289, 89 S. Ct. 323 (1968); *Construction Indus. Ass'n v. Petaluma,* 522 F.2d 897, 909 (9th Cir. 1975), *cert. denied,* 424 U.S. 934, 47 L. Ed. 2d 342, 96 S. Ct. 1148 (1976).

Moreover, the burden usually envisioned in the balancing cases relates to the actual instrumentalities of interstate commerce, *i.e.,* the mode of transportation that permits free physical flow of goods. *American Can Co.,* at 637; *Southern Pac. Co. v. Arizona ex rel. Sullivan, supra; Bibb v. Navajo Freight Lines, Inc., supra.*

> There has thus been left to the states wide scope for the regulation of matters of local state concern, even though it in some measure affects the commerce, provided it does not materially restrict the free flow of commerce across state lines, or interfere with it in matters with respect to which uniformity of regulation is of predominant national concern.

*Southern Pac. Co.,* at 770.

Thus, where the claimed state benefit and the impact upon interstate commerce are grossly disproportionate, the disparity is apparent without undertaking a balancing process. In the absence of "predominant national concern", the state need only establish that there is some state benefit and that the means chosen reasonably furthers the state goal. *American Can Co.,* at 632; *Construction Indus. Ass'n,* at 909. Clearly, the benefit envisioned by our legislature, made explicit in the usury act, RCW 19.52.005, is to protect Washington citizens from unreasonably high interest rates. In addition, RISA's statutory interest ceiling enacted by voter initiative clearly furthers that goal.

Appellant argues, however, that Washington's 12 percent ceiling on interest rates unconstitutionally discriminates against out–of–state sellers, which is likewise barred by the

commerce clause. *Hunt v. Washington Apple Advertising Comm'n,* 432 U.S. 333, 53 L. Ed. 2d 383, 97 S. Ct. 2434 (1977). But the usury statute and RISA treat all mail order and other retail sellers alike. A Washington mail order house doing business here would face the same marketing problems as an interstate seller with respect to the 12 percent interest ceiling. Local retail sellers in Washington may charge only 12 percent interest in their credit dealings, and appellant is merely required to adhere to this same equally applicable rate. *American Can Co.,* at 642; *Aldens, Inc. v. Packel,* 524 F.2d 38, 46–47 (3d Cir. 1975); *State ex rel. Meierhenry v. Spiegel, Inc.,* ___ S.D. ___, 277 N.W.2d 298, 301–02 (1979). We find no discrimination.

The last question we must decide is whether our decision should have a retroactive effect. In light of the impact on presently existing agreements entered into over many years in reliance on the usury statute, RCW 19.52, as construed in *Hafer v. Spaeth,* 22 Wn.2d 378, 156 P.2d 408 (1945), we think justice requires that this decision be applied prospectively only, except for a limited retroactive application to the parties in this case.

Courts may give a party the benefit of its own lawsuit, where that party has prevailed in its contention that the old law should be overruled. *Cascade Security Bank v. Butler,* 88 Wn.2d 777, 784, 567 P.2d 631 (1977). However, "[a]ppellate courts possess the power to give their decisions prospective effect, *i.e.,* not to apply the decision to the parties in the overruling case." *Cascade Security Bank,* at 785. If a party has justifiably relied on the overruled case, we must decide whether a retroactive application of the over-ruling decision would defeat these reliance interests. *Geise v. Lee,* 10 Wn. App. 728, 732–33, 519 P.2d 1005 (1974), *rev'd on other grounds,* 84 Wn.2d 866, 529 P.2d 1054 (1975).

Over the years since the *Hafer* decision, there have been untold numbers of transactions in reliance on that decision. Indeed, the Attorney General has recently published an opinion advising that the usury statute did not apply to

installment sales of real property and relying on *Hafer*. Attorney General Opinion, May 20, 1980. It would be unfair now to give our decision a general retroactive effect and expose well meaning vendors to the consequences of charging interest that has become usurious as a result of this decision. Thus, as to all affected persons not parties to this lawsuit, the decision will apply prospectively only from the date of filing.

As to the parties herein, however, there has been no reliance on *Hafer*. Respondents, the prevailing parties, urged that *Hafer* be overruled, as we have done. Spiegel has never relied on *Hafer*, since it at all times during this litigation insisted that Illinois law applied to the subject transactions. As a result, it has suffered no hardship occasioned by its reliance on *Hafer*. Accordingly, the decision is given limited retroactive effect as to the parties to this lawsuit only. *Cascade Security Bank v. Butler, supra; Taskett v. KING Broadcasting Co.*, 86 Wn.2d 439, 546 P.2d 81 (1976).

Since we hold that Washington law applies, respondents' argument that appellant's activities in Washington violate Const. art. 12, § 7 is rendered moot. The judgment of the trial court is affirmed as modified on the question of the applicability of the Consumer Protection Act.

BRACHTENBACH, C.J., and ROSELLINI, STAFFORD, UTTER, DOLLIVER, and HICKS, JJ., concur.

Reconsideration denied June 4, 1981.