[No. 58059-6.   En Banc.   November 25, 1992.]

JOHN ZACHMAN, ET AL, *Respondents,* v. WHIRLPOOL ACCEPTANCE CORPORATION, *Petitioner.*

*Perkins Coie*, by *Thomas L. Boeder* and *William A. Kinsel*, for petitioner.

*Davis, Arneil, Dorsey, Kight & Parlette*, by *Robert L. Parlette; Lacy, Kane & Richardson, Inc., P.S.*, by *Scott M. Kane*, for respondents.

*Edward N. Lange, Stephen M. Rummage,* and *Debora K. Kristensen* on behalf of Washington Retail Association, amicus curiae for petitioner.

*Kenneth O. Eikenberry, Attorney General, Owen F. Clarke, Jr., Senior Assistant,* and *Robert F. Manifold, Assistant,* amicus curiae for respondents.

*Robert H. Whaley, Bryan P. Harnetiaux,* and *Victoria L. Vreeland* on behalf of Washington State Trial Lawyers Association, amicus curiae for respondents.

[As amended by order of the Supreme Court February 12, 1993.]

BRACHTENBACH, J. — This case concerns interpretation of RCW 63.14, the Retail Installment Sales of Goods and Services Act (RISA). The main issue is narrow because it involves specific forms employed by defendant Whirlpool Acceptance Corporation, now known as Whirlpool Financial Corporation (Whirlpool) in two particular transactions. Because plaintiffs have sought class action certification the holding has broader implications if the class is certified on remand.

The trial court granted plaintiffs' partial summary judgment, declaring defendant's financing devices in violation of RISA. Clerk's Papers, at 252-54. Class certification and damages were reserved. We affirm and remand for further proceedings.

This dispute arises from the purchase of a clothes dryer by plaintiffs Zachman and the purchase of a dishwasher by plaintiffs Crossler. The appliances were purchased from different independent retailers; Whirlpool is not a retail seller. Whirlpool financed each purchase. Mrs. Zachman and Mr. Crossler each signed a preprinted form entitled Revolving Charge Plan Agreement. Mrs. Zachman also signed a sales memorandum. The forms are appended to this opinion.

The essence of plaintiffs' case is that Whirlpool's financing instruments are not valid revolving charge agreements

under RISA.[1] If the agreements are not valid revolving charge agreements, they must be either retail installment contracts or lender credit card agreements. Those are the three mutually exclusive types of agreements authorized by RISA. RCW 63.14.010(3), (9), (10). The three types of agreements differ in disclosures required, allowable service charge (essentially interest), and recognition of a security interest in the property purchased.

The disclosures required at the time of purchase are much more detailed and informative for the retail installment contract. *See* RCW 63.14.020, .030, .120. The disclosure required for a retail installment sale shows the cost of credit because the statute mandates a statement of the sale price and the full credit price. RCW 63.14.040. The minimal disclosure for revolving charge agreements and lender credit card agreements does not reveal the total credit price. RCW 63.14.120.

Revolving charge agreements and lender credit card agreements may charge 1½ percent per month, *i.e.*, 18 percent per year. In contrast, the maximum rate on a retail installment contract varies because it is tied to the 26-week treasury bill rates. Former RCW 63.14.130. In 1992 the maximum rate for a retail installment purchase was 11.75 percent,[2] rather than 18 percent. The rate differential has been extinguished.[3]

The third difference is that a lender credit card agreement may not provide for a security interest to secure performance. The others may create a security interest. RCW 63.14.125.

---

[1]Under the statute "retail charge agreement", "revolving charge agreement", or "charge agreement" all mean the same thing. RCW 63.14.010(10). We refer to such device as a revolving charge agreement.

[2]State Register 92-01 (1992).

[3]Amendments in 1992 to RISA eliminate the differences among the financing devices. Laws of 1992, ch. 193, § 1(1), (2). This change does not affect our analysis because we apply the statute previously applicable.

Our review of the granting of a summary judgment is governed by oft-stated rules which need not be repeated. *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982).

Before examining in detail the applicable statutes, it is helpful to consider the history of installment sales regulation. The general purpose of such legislation has been summarized thusly:

> The principal function of these statutes appears simply to be the protection of credit consumers against excessive gouging by those dealers and financiers who, taking advantage of the public's notorious indifference to finance rates, exact exorbitant charges. That such overreaching is widespread is well known in the business community. Hence, these statutes stand, like the usury acts, above the fluctuations of the credit market, constituting the outer limits, as it were, of fiscal morality.

(Footnote omitted.) Warren, *Regulation of Finance Charges in Retail Instalment Sales*, 68 Yale L.J. 839, 854 (1958-1959).

■ As noted above, the retail installment contract requires the most detailed disclosure of the true cost of a credit purchase. This is recognized as the central purpose of the Washington statute:

> The central provisions of the Retail Installment Sales Act concern the itemization and disclosure of amounts owed by the buyer . . . .. These provisions are central because they allow the buyer to determine the price of the credit transaction and the price of its various components.

3 Washington State Bar Ass'n, *Commercial Law Deskbook* § 28.5(4), at SU-28-25 (1987).

The marked differences attaching to the three types of agreements authorized by the statute are consistent with the historical uses thereof:

> [T]he disclosure requirements for retail charge agreements and lender credit card agreements, which comprise the principal regulations of such agreements, are much simpler than those applicable to retail installment contracts. *The differences in regulation undoubtedly stem from the character of the transactions and perceived abuses and potential abuses with them.*

(Italics ours.) 3 *Commercial Law Deskbook* § 28.5(11), at SU-28-43.

More specifically, the history demonstrates that the type of goods purchased by these plaintiffs, a clothes dryer and a dishwasher, represent the typical retail installment contract transaction. The authors of the Washington *Commercial Law Deskbook*, more than 20 years after the enactment of RISA, noted this substantial difference:

> Retail installment contracts generally have been used in the sale of medium to high-priced items, such as automobiles and major appliances. *See* Curran, *Trends in Consumer Credit Legislation*, 11 (1965). A retail charge or revolving charge agreement, on the other hand, is an agreement prescribing the terms under which a buyer may make various credit purchases from a seller from time to time. *See*, RCW 63.14-.010(10). . . . Revolving charge agreements generally are employed by department and other stores in the sale of items relatively lower priced than those mentioned above (Curran, *supra*) and frequently involve the use of a charge card. . . . Some of the substantive and remedial provisions of the Act apply to all three types of retail installment transactions; some, however, relate exclusively to one type or another. The transactions are treated differently because of the different manner of effecting and performing under the agreements.

3 *Commercial Law Deskbook* § 28.3(1), at SU-28-6, -7.

Those same authors conclude that:

> The Act [RISA] expressly excludes retail charge agreements and sales made pursuant thereto from the definition of retail installment contracts. *The exclusion exists to avoid subjecting retail charge agreements to provisions of the Act that are not suited to that type of transaction.*

(Italics ours.) 3 *Commercial Law Deskbook* § 28.3(2), at SU-28-7.

There is evidence in the literature, written before the enactment of the Washington statute, that the types of goods here involved were not intended as the subject of a revolving charge agreement such as used by Whirlpool. "The installment account also commonly involves only one purchase, usually of high unit value, while the revolving account presupposes a series of purchases usually of low unit value." Project, *Legislative Regulation of Retail Installment Financing*, 7 U.C.L.A. L. Rev. 623, 644 (1960). The

revolving charge account was "designed primarily to stimulate the sale of soft goods." Its ultimate objective was "to achieve one flexible account covering all purchases except high-priced major appliances." (Footnote omitted.) Robinson, *New Developments in Retail Financing*, 8 U. Kan. L. Rev. 554, 563 (1959-1960).

The recognized difference in purpose and historical use of the installment contract and the revolving charge agreement is implicit in the greater information and protection to the installment contract purchaser which the Legislature provided in RISA. Typically such purchase would involve items which were relatively high priced and virtual family necessities such as the refrigerator, clothes washer and dryer or stove.

We now turn to the statute. Whirlpool's financing device is valid only if it is a revolving charge agreement which is defined by RCW 63.14.010(10):

> "[R]evolving charge agreement," . . . means *an* agreement . . . prescribing the terms of *retail installment transactions* which may be made *thereunder* from time to time . . ..

(Italics ours.)

It must be noted that the reference is to *an* agreement, *i.e.*, a single agreement. Subsequent purchases must be made *thereunder*, that is, under the single, original and only agreement. As demonstrated hereafter that is impossible under the terms of the Whirlpool documents. Further, the definition of revolving charge agreement contemplates more than one transaction because it refers to retail installment transactions under *an* agreement. RCW 63.14.010(10).

A retail installment transaction must involve a retail *seller* and a retail buyer. RCW 63.14.010(8). Whirlpool is not a retail seller. Yet the retail transactions which can be financed by a revolving charge agreement are defined as purchases from a retail seller. Whirlpool argues, however, that this analysis must fail because RISA authorizes lender credit card agreements, but such lender credit card issuers

cannot be "[p]rincipally engaged in the business of selling goods". RCW 63.14.010(2)(a). Therefore, Whirlpool reasons the revolving charge agreement can be provided by a creditor and is not limited to retail sellers. Reply Brief of Defendant, at 23-24. The plain answer to this argument is that when the Legislature intended that a third party creditor be involved, it so provided. The provisions of RCW 63.14.010(3) specifically authorize the third party's purchase, with the buyer's consent, of the buyer's indebtedness to the retail seller. The indebtedness may be evidenced by a sales slip or memorandum, just as was done in the Zachman purchase. No such third party involvement is mentioned in the revolving charge statutory provisions which, we repeat for emphasis, refer to retail installment transactions and which by definition must involve a retail seller.

Notwithstanding this definitional problem, there is an alternate ground upon which our conclusion rests. Even if the statute were interpreted to permit a creditor to provide the revolving charge agreement, the Whirlpool scheme still violates RISA. As noted above, the statute defines a revolving charge agreement in the singular, *i.e.*, *an* agreement which prescribes the terms of retail installment transactions (*i.e.*, multiple transactions) *thereunder* from time to time. RCW 63.14.010(10). "Thereunder" can only refer to the original, one, single revolving charge agreement. Repeat transactions must be made pursuant to that one agreement.

Whirlpool's argument is based on it being the creditor which contemplates repeated extensions of credit *under* the original transaction. Brief of Petitioner, at 28.

The agreement which plaintiff Crossler signed identifies the parties as follows: "BUYER Anthony Crossler" "SELLER (CREDITOR) Enterprize Mart". It goes on: "The words 'we', 'us', and 'our' refer to the Seller." Clerk's Papers, at 127. The printed form contains this language: "[T]he Seller (Creditor) hereby sells, transfers and sets over to WHIRLPOOL . . . this agreement . . .." Clerk's Papers, at 128.

There are two reasons why Whirlpool is not a party to a revolving charge agreement contemplated by the statute. First, by the very terms of the agreement the seller-creditor is the retail seller, Enterprize Mart. Second, that seller-creditor assigns *the agreement* to Whirlpool. If Whirlpool were a party to the agreement and if that agreement (wherein Enterprize Mart is the seller-creditor) provided for future purchases *thereunder*, it would be an anomaly and an inconsistency for Whirlpool to be assigned that agreement. Thus, Whirlpool is not a retail seller and it is not a party to the so-called revolving charge agreement. It is merely an assignee from the seller-creditor.

The Zachman agreement is different in form. Clerk's Papers, at 124. It identifies the retail seller in that particular transaction, but refers to the purchase of other goods from other sellers authorized by Whirlpool. However, other terms again show it to be at best a hybrid of some sort. There is this statement: "You hereby request that if a credit card is available, that one be issued to you." Clerk's Papers, at 124.

Further, the agreement states: "It is expected that this agreement and purchases made under it will be submitted for approval to Whirlpool . . .." Clerk's Papers, at 124. Additionally, it refers to goods "described in sales memoranda". Both of these terms are more consistent with lender credit card agreements described in RCW 63.14.010(3). The reference to consent and a sales memorandum are both part of the definition of a lender credit card agreement.

■ As noted above, the statute defining a revolving charge agreement contemplates multiple transactions under a single agreement. RCW 63.14.010(10). Yet the Zachman agreement provides that all purchases, obviously including future purchases, are not binding on Whirlpool until credit is approved, and only upon approval is the transaction assigned to Whirlpool. Clerk's Papers, at 124. The agreement provides no qualification to approval. It simply reserves to Whirlpool the right of approval, without further notice to the buyer, and only if

approved does Whirlpool become involved and then as an assignee.

The Zachman agreement contains an assignment of the "sales memorandum" to Whirlpool. Again, this is consistent with the specific reference in the lender credit card agreement definition with its reference to "a sales slip or memorandum". RCW 63.14.010(3).

Whirlpool argues that its agreements "anticipate and provide for multiple retail transactions rather than a singular retail transaction." Clerk's Papers, at 186 (affidavit of Whirlpool vice-president). That conclusion of law is contradicted by the very terms of the agreements where Whirlpool is not obligated to approve any subsequent purchases. Clearly the agreements do not set a particular amount of credit which would permit additional transactions "from time to time" as set out in RCW 63.14.010(10).

■ Under the terms of the Crossler agreement it is impossible for the buyer to make additional purchases *thereunder* as required by RCW 63.14.010(10). That original agreement shows the seller-creditor as Enterprize Mart. No other retailer could sell *thereunder* because the agreement is assigned to Whirlpool, which is not a retail seller. There could never be subsequent retail installment transactions *thereunder* because the statute defines such events as involving a retail seller. RCW 63.14.010(8). The fact that in some cases there have been repeat purchases financed by Whirlpool (Clerk's Papers, at 189) does not abrogate the requirements of the statute.

There is a term in both agreements which clearly demonstrates the fallacy of Whirlpool's analysis. RCW 63.14.120 mandates the contents of a revolving charge agreement. Included is the requirement that in the revolving charge agreement the buyer be notified that the buyer, under certain conditions, may cancel any purchase thereunder. The critical point is that the statute requires the buyer to give notice to the seller "*at his address shown on the charge agreement . . ..*" (Italics ours.) RCW 63.14.120(3)(d).

If there is a subsequent retail transaction, as contemplated by the statute, and if it involves another retail seller, as Whirlpool argues is permitted, it is obvious that the address of the seller will be different from that shown on the original agreement. If the subsequent seller uses another Whirlpool agreement, it is equally obvious that the second purchase was not made under *an* agreement which provides for repeat sales thereunder. In either event, the repeat transaction cannot meet the terms of the statute which describes *an* agreement with repeat purchases *thereunder*. RCW 63.14.010(10). The fact RCW 63.14.120(3)(d) refers to the seller (singular) and the address shown on the charge agreement (singular) confirms the theory that the statute contemplates a revolving charge agreement with a retail seller who permits repeat purchases under a single agreement. Whirlpool's scheme would permit multiple sellers under multiple revolving charge agreements. That is not what the statute permits.

▇ Courts traditionally "look through the form of the transaction and consider its substance.' " *Whitaker v. Spiegel, Inc.*, 95 Wn.2d 661, 669, 623 P.2d 1147, 637 P.2d 235 (1981) (quoting *Hafer v. Spaeth*, 22 Wn.2d 378, 383, 156 P.2d 408 (1945)). It is interesting to note that in a reaffirmation agreement, signed after the Zachmans went into bankruptcy, Whirlpool describes its financing arrangement as a "promissory note-security agreement". Clerk's Papers, at 157. That is Whirlpool's own description and hardly comports with a revolving charge agreement.

We hold that Whirlpool's revolving charge agreements, in the two forms here presented, are not valid revolving charge agreements under the terms of RISA.

If these agreements are rather held to be retail installment contracts, they violate RISA because they do not make required disclosures, and they impose a service charge in excess of that permitted by statute. The trial court, in granting summary judgment, held the Whirlpool agreements to be retail installment contracts. Clerk's Papers, at 252-54.

After the Court of Appeals granted discretionary review, plaintiffs moved in the trial court for permission to file a third amended complaint to allege as an alternative ground that the Whirlpool financing arrangement constituted a lender credit card agreement. After submission of briefs and argument, the trial court granted the motion, subject to approval by the Court of Appeals. That approval was given.

Whirlpool now claims error in allowing the amendment, contending it did not have a full opportunity to develop facts relating to a lender credit card agreement theory. Reply Brief of Defendant, at 27. Whirlpool does not suggest what those facts might be which it asserts it did not have an opportunity to present. While plaintiffs cast their original claim for relief in terms of finding the arrangements to be a retail installment contract, the subject of lender credit card agreements was discussed in the briefing. Clerk's Papers, at 203-06. The amendment was within the discretion of the trial court and was confirmed by the Court of Appeals. RAP 7.2(e). We find no error.

If these documents did constitute lender credit card agreements, they would violate RISA because they retain a security interest, prohibited by RCW 63.14.125.

Because of the hybrid nature of Whirlpool's financing device it is difficult to fit the documents within the statutory scheme. However, after determining that they are not valid revolving charge agreements, we agree with the trial court that Whirlpool has created in effect a retail installment contract the terms of which violate RISA. Clerk's Papers, at 250.

The order granting plaintiffs' motion for partial summary judgment and denying defendant's motion for partial summary judgment is affirmed. Clerk's Papers, at 252-54. The matter is remanded for further proceedings.

DORE, C.J., and UTTER, ANDERSEN, DURHAM, SMITH, and JOHNSON, JJ., concur.

## APPENDIX A

## REVOLVING CHARGE PLAN AGREEMENT

**Account:** This agreement applies to your revolving charge plan purchase of the goods described in sales memoranda from Seller or from other Sellers of goods authorized by Whirlpool Acceptance Corporation. In this agreement the words "you," "yours" mean the Buyer signing below. The words "we," "us," and "our" refer to the Seller indicated below, other sellers of goods authorized by Whirlpool Acceptance Corporation, and Seller's contemplated assignee, Whirlpool Acceptance Corporation. By signing sales memoranda, you agree those purchases will be controlled by this agreement.

**Promise to Pay:** You promise to pay for your purchases according to the terms of this agreement.

**FINANCE CHARGES:** You may pay the unpaid balance in installments and if you do, finance charges will be added to your account. Finance charges will be imposed on any purchases if they are not paid in full within 25 days of the date of the billing statement. We figure the FINANCE CHARGE by multiplying the Average Daily Balance of your account by the periodic rate.

| FINANCE CHARGE SCHEDULE: STATE | MONTHLY PERIODIC RATE(S) | ANNUAL PERCENTAGE RATE(S) |
|---|---|---|
| Massachusetts, Washington | 1.5% | 18% |

**Average Daily Balance:** To get the Average Daily Balance, we take the beginning balance of your account each day and subtract any payments or credits, returned check charges, and any unpaid finance charges. We do not add in any new purchases. This gives us the daily balance. Then we add all the daily balances for the billing cycle together and divide the total by the number of days in the billing cycle. This gives us the Average Daily Balance.

**Payments:** You will receive a billing statement each month in accordance with the schedule of payments below as long as there is a balance due. Each installment is due within 25 days of the billing date shown on the statement. Your payments will be applied to each item purchased on a first in, first out basis. You will make payments to the place designated by us.

**Schedule of Payments**

| PURCHASE BALANCE UP TO: | MINIMUM MONTHLY PAYMENT | PURCHASE BALANCE UP TO: | MINIMUM MONTHLY PAYMENT |
|---|---|---|---|
| 275 | 12 00 | 550 | 24 00 |
| 300 | 13 00 | 600 | 26 00 |
| 325 | 14 00 | 650 | 28 00 |
| 350 | 15 00 | 700 | 30 00 |
| 375 | 16 00 | 750 | 32 00 |
| 400 | 17 00 | 800 | 34 00 |
| 425 | 18 00 | 850 | 36 00 |
| 450 | 19 00 | 900 | 38 00 |
| 475 | 20 00 | 950 | 40 00 |
| 500 | 21 00 | 1000 | 42 00 |

For balances over $1000, divide by 26 for the monthly payment

**Payment Option:** You may pay the balance due (New Balance) of any monthly statement in full within 25 days of the billing date of the statement and if you do you will not be charged any finance charge for the billing cycle in which the full payment is made.

**Security Interest:** Under the Uniform Commercial Code, we are retaining a purchase money security interest in the goods being purchased until you pay us what you owe under this agreement.

**Default:** If for any reason you fail to make any payment on time, you shall be in default. Then, at our option, payment of the entire remaining balance due on this agreement shall become due. After default, we may take legal action to collect the amount you owe, or to enforce our security interest as allowed by the laws of your state.

**Protection of Goods:** You agree to be responsible for any loss or damage to the goods being purchased.

**Credit Record:** You agree that your credit record may be investigated and how you pay us may be reported to proper persons and credit bureaus.

**Credit Card:** You hereby request that if a credit card is available, that one be issued to you. You agree to notify Whirlpool Acceptance Corporation immediately of the loss, theft, or unauthorized use of your credit card. You agree that the credit card issued to you remains the property of Whirlpool Acceptance Corporation and may be cancelled or repossessed at any time. You agree that minimum purchase amounts may apply to credit card purchases.

**Credit Capacity and Limit:** This agreement and all purchases made under it are not binding on us until your credit is approved. You agree that your outstanding balance under this agreement will not exceed your credit limit. In addition you agree that we may change your credit limit from time to time, based on changes in your credit capacity.

**Returned Check Charge:** You agree that if you make a payment with a check, money order, or other item which is returned to us unpaid, we may add to your account, and you agree to pay, a charge of up to $10 00, when permitted by state law.

**Changes in Terms:** The above terms are subject to change. If any terms are changed, you will be given notice in accordance with state and federal law.

**Assignment:** It is expected that this agreement and purchases made under it will be submitted for approval to Whirlpool Acceptance Corporation, 553 Benson Road, Benton Harbor, Michigan 49022, without further notice to you, and, if approved, will be assigned to Whirlpool Acceptance Corporation.

**Notice To Buyer:** (1) Do not sign this agreement before you read it or if any spaces intended for the agreed terms are left blank. (2) You are entitled to an exact copy of this agreement at the time you sign it. (3) You may at any time pay off the full unpaid balance under this agreement. (Massachusetts only:) (4) You may under certain circumstances redeem the property, if repossessed because of our default, and you may, under certain conditions require a resale of the property if repossessed. (5) The Seller has no right to unlawfully enter your premises or commit any breach of the peace to repossess goods purchased under this agreement. (6) You may cancel a purchase under this agreement if it has been signed by a party thereto at a place other than the address of the Seller which may be his main office or branch thereof; provided, you notify the Seller in writing at his main office or branch by ordinary mail posted, by telegram sent or by delivery, not later than midnight of the third business day following a purchase under this agreement.) (Washington only: (4) You may cancel any purchases made under this charge agreement if the Seller or his representative solicited in person such purchase, and you sign an agreement for such purchase, at a place other than the Seller's business address shown on the charge agreement, by sending notice of such cancellation by certified mail return receipt requested to the Seller at his address shown on the charge agreement, which notice shall be posted not later than midnight of the third day (excluding Sundays and holidays) following your signing of the purchase agreement. If you choose to cancel this purchase, you must return or make available to Seller at the place of delivery any merchandise, in its original condition, received by you under this purchase agreement.)

I have read this REVOLVING CHARGE PLAN AGREEMENT and have received a completely filled in copy.

X _Thomas L. Zachman_ 10-4-86

BUYER SIGNATURE          DATE

**NOTICE: See reverse side for important information regarding your rights to dispute billing errors.**

PLACE STORE STAMP HERE

SELLER _Miley's Inc._

ADDRESS _P.O. Box T_

CITY _Omak_          STATE _WA_ ZIP _98841_

**(WHIRLPOOL ACCEPTANCE CORPORATION COPY)**

RCP-102 (1-86)   (MA & WA ONLY)

## ZACHMAN SALES MEMORANDUM
### (Front Page)

Whirlpool Acceptance Corporation

BUYER Donald J Zachann

ADDRESS 51 Vancreschelda Rd.

CITY Tonasket

STATE WA. ZIP 98855

SS# 534-46-C969

Acct. # _____

I promise to pay the amount shown as TOTAL (together with any other charges due thereon) subject to and in accordance with my REVOLVING CHARGE PLAN AGREEMENT.

BUYER'S SIGNATURE

X _____

SELLER Daley's PC Port

ADDRESS Omak WA 98841

BY Lila McDonald

**SALES MEMORANDUM.**
**(Revolving Charge Plan Purchase)**

| SERIAL NO. | MODEL NO. | DESCRIPTION | | PRICE | |
|---|---|---|---|---|---|
| m6254 5653 | LE7685 | Whirlpool Dryer | | 389 | 95 |
| | | | | | |
| | | | | | |

| | | |
|---|---|---|
| Trade-In Description: | Subtotal | 389 95 |
| Special Plan Description: | Sales Tax | 29 05 |
| | Subtotal | 419 00 |
| | Cash Down Payment $ ⟨ | |
| DATE 11-4-86 AUTH. Zander Plan # | Trade-In $ ⟨ / Total Down Payment | ⟨0 |
| DEALER # 51284 17 151-191 1-1 | TOTAL | 419 00 |

RCP-101 (11-85)

## ZACHMAN SALES MEMORANDUM
### (Reverse Side)

**SELLER'S ASSIGNMENT**

For valuable consideration, the receipt whereof is hereby acknowledged, the Seller hereby sells, transfers and sets over to WHIRLPOOL ACCEPTANCE CORPORATION, this Sales Memorandum and all right, title, and interest in and to the goods being purchased under the warranties, terms and provisions of the agreement between the Seller and Whirlpool Acceptance Corporation.

(See reverse side for Seller's Signature to Assignment)

318

## Appendix B

✓ CKP003   DEAL••1

**Whirlpool Acceptance**   REVOLVING CHARGE PLAN AGREEMENT

DATE _11/2/_ 19 _85_

BUYER _Anthony___Crowder___ SELLER (CREDITOR) _Enterprise Mart_

PLEASE PRINT ADDRESS _Box 1330_ ADDRESS _Box 728_

CITY _Mama___ STATE _Wa_ ZIP _98831_ CITY _Chila_ STATE _Wa_ ZIP _98816_

This agreement applies to your revolving charge plan purchase of the goods described below. In this agreement the words "you", "yours" mean the Buyer signing below. The words "we", "us", and "our" refer to the Seller.

| SERIAL NO | MODEL NO. | NEW USED | DESCRIPTION | PRICE |
|---|---|---|---|---|
| S012253 | DU5000 | | Whirlpool Dishwasher | 479 95 |
| | | | Installation | 75 00 |
| | | | | |
| | | | | |

*(DESCRIPTION OF TRADE—IN)

| | | |
|---|---|---|
| SALES TAX | 41 | 62 |
| TOTAL | $ 596 | 57 |

CASH PRICE (INCLUDING SALES TAX) $ 596 57
CASH DOWNPAYMENT $ 96 57
*TRADE-IN $ -0-
TOTAL DOWNPAYMENT $ 96 57
UNPAID BALANCE $ 500 00

**Promise to Pay:** You promise to pay for your purchase(s) according to the terms of this agreement.
**FINANCE CHARGES:** You may pay the unpaid balance in instalments and if you do finance charges will be added to your account. Finance charges will be imposed on any purchases if they are not paid in full within 25 days of the date of the billing statement. We figure the FINANCE CHARGE by multiplying the Average Daily Balance of your account by the periodic rate. The periodic rate is 1.5% per month (18% ANNUAL PERCENTAGE RATE).
**Average Daily Balance:** To get the Average Daily Balance we take the beginning balance of your account each day and subtract any payments or credits and any unpaid finance charges. We do not add in any new purchases. This gives us the daily balance. Then, we add all the daily balances for the billing cycle together and divide the total by the number of days in the billing cycle. This gives us the Average Daily Balance.
**Payments:** You will receive a billing statement each month in accordance with the schedule of payments on the reverse side as long as there is a balance due. Each instalment is due within 25 days of the billing date shown on the statement. Your payments will be applied to each item purchased on a first in, first out basis. You will make payments to the place designated by us.
**Payment Option:** You may pay the balance due (New Balance) of any monthly statement in full within 25 days of the billing date of the statement and if you do you will not be charged any finance charge for the billing cycle in which the full payment is made.
**Security Interest:** Under the Uniform Commercial Code, we are retaining a purchase money security interest in the goods being purchased until you pay all you owe under this agreement.
**Additional Purchases:** You may buy additional goods under this revolving charge plan and the unpaid balance of each purchase will be added to your account subject to verification of credit information about you.
**Default:** If for any reason you fail to make any payment on time, you shall be in default. Then, at our option, payment of the entire remaining balance due on this agreement shall become due. After default we may take legal action to collect the amount you owe, or to enforce our security interest as allowed by the laws of your state.
**Collection Fees:** Upon default, you agree to pay reasonable attorney fees not to exceed 15% of the amount due, when permitted by state law, if we refer this agreement for collection to an attorney that is not our salaried employee.
**Protection of Goods:** You agree to be responsible for any loss or damage to the goods being purchased.
**Credit Record:** You agree that your credit record may be investigated and how you pay us may be reported to proper persons and credit bureaus.
**Changes in Terms:** The above terms are subject to change. If any terms are changed you will be given notice in accordance with state and federal law.
**Assignment:** You agree that this agreement may be assigned.

**NOTICE TO BUYER:** (a) Do not sign this retail charge agreement before you read it or if any spaces intended for the agreed terms are left blank. (b) You are entitled to a copy of this charge agreement at the time you sign it. (c) You may at any time pay off the full unpaid balance under this charge agreement. (d) You may cancel any purchases made under this charge agreement if the seller or his representative solicited in person such purchase, and you sign an agreement for such purchase, at a place other than the seller's business address shown on the charge agreement, by sending notice of such cancellation by certified mail return receipt requested to the seller at his address shown on the charge agreement, which notice shall be posed not later than midnight of the third day (excluding Sundays and Holidays) following your signing of the purchase agreement. If you choose to cancel this purchase, you must return or make available to seller at the place of delivery any merchandise, in its original condition, received by you under this purchase agreement.

ACCEPTED: This agreement is hereby assigned under the terms of the Seller's assignment on the reverse side.

SELLER _Enterprise Mart_

BY _Charlene Shively_ DATE _Nov/2 85_

RCP-285 (3-84)   P.O. 725

FOR CUSTOMER

I have read this REVOLVING CHARGE PLAN AGREEMENT and have received a completely filled in copy. I have read the reverse side and understand that those terms are also part of this agreement.

BUYER _Anthony C Crowder_
NOTICE: See reverse side for important information regarding your rights to dispute billing errors.

# APPENDIX B
## (Reverse Side)

### ADDITIONAL TERMS AND CONDITIONS

#### SCHEDULE OF PAYMENTS

| PURCHASE BALANCE UP TO: | MINIMUM MONTHLY PAYMENT | PURCHASE BALANCE UP TO: | MINIMUM MONTHLY PAYMENT |
|---|---|---|---|
| 275 | 12.00 | 650 | 24.00 |
| 300 | 13.00 | 600 | 26.00 |
| 325 | 14.00 | 650 | 28.00 |
| 350 | 15.00 | 700 | 30.00 |
| 375 | 16.00 | 750 | 32.00 |
| 400 | 17.00 | 800 | 34.00 |
| 425 | 18.00 | 850 | 36.00 |
| 450 | 19.00 | 900 | 38.00 |
| 475 | 20.00 | 950 | 40.00 |
| 500 | 21.00 | 1000 | 42.00 |

For balances over $1000 divide by 26 for the monthly payment.

#### SELLER'S ASSIGNMENT

For valuable consideration, the receipt whereof is hereby acknowledged, the Seller (Creditor) hereby sells, transfers and sets over to WHIRLPOOL ACCEPTANCE CORPORATION, this agreement, and all right, title, and interest in and to the goods being purchased and all rights and remedies under this agreement.

All warranties, terms and provisions of an agreement between the Seller (Creditor) and Whirlpool Acceptance Corporation.are made a part of this agreement by reference and upon which Whirlpool Acceptance Corporation relies in purchasing this agreement.

(See reverse side for Seller's Signature to Assignment)

#### YOUR BILLING RIGHTS
#### KEEP THIS NOTICE FOR FUTURE USE

This notice contains important information about your rights and our responsibilities.under the Fair Credit Billing Act.

**Notify Us In Case of Errors or Questons About Your Bill**

If you think your bill is wrong, or if you need more information about a transaction on your bill, write us on a separate sheet at, Whirlpool Acceptance Corporation, 553 Benson Road, Benton Harbor, MI 49022. Write to us as soon as possible. We must hear from you no later than 60 days after we send you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:
* Your name and account number.
* The dollar amount of the suspected error.
* Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

**Your Rights and Our Responsibilities After We Receive Your Written Notice**

We must acknowledge your letter within 30 days, unless we have corrected the error by then. Within 90 days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can.continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your credit limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date that it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you or you write to us within ten days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. And, we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

#### NOTICE

ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

GUY, J. (dissenting) — The majority holds that the agreements the Zachmans and Crosslers signed with Whirlpool are not valid revolving charge agreements under the terms of the retail installment sales act (RISA). I disagree.

The majority's principal reason for its holding is what it calls a "definitional problem" with recognizing the Whirlpool agreements as revolving charge agreements. Majority opinion, at 311. According to the majority, the statutory definition of a revolving charge agreement in RCW 63.14.010(10) requires that such agreements be between a retail buyer and a retail seller. The majority then reasons that because Whirlpool is not a retail seller, Whirlpool cannot, by definition, enter into revolving charge agreements. The error in the majority's reasoning is that it is confusing who may enter into a retail installment transaction with who may enter into a revolving charge agreement. Consider closely the definition in RCW 63.14.010(10):

"[R]evolving charge agreement," . . . means an agreement . . . prescribing the terms of retail installment transactions which may be made thereunder from time to time . . ..

The crucial question is whether under this definition the party providing the financing, the creditor, must be the retail seller in the underlying retail installment transactions. I would answer yes if "revolving charge agreement" were defined to be an agreement *between a consumer and a retail seller* prescribing the terms of any present or future retail installment transactions between them. That is not the way "revolving charge agreement" is defined in RCW 63.14.010(10). One must keep clearly in view that revolving charge agreements are fundamentally financing agreements; they prescribe the financing terms for retail installment transactions. The creditor under RCW 63.14.010(10) is simply the party providing the consumer with the needed financing to make retail installment transactions. In other words, under RCW 63.14.010(10), "revolving charge agreement" means an agreement between a consumer and a *creditor* prescribing the terms under which the creditor will

provide financing to the consumer for any present or future retail installment transactions between the consumer and retail sellers. There is no requirement in RCW 63.14-.010(10) that the creditor under the revolving charge agreement must be the retail seller in the retail installment transactions that are made possible by the financing provided under the agreement. The creditor *may* be the retail seller, but the statute does not require that. Again, the statute leaves entirely open the possibility that a retail buyer, B, may enter into a revolving charge agreement with a creditor, C, under which C finances B's purchases from a retail seller, S, and where *C and S are not the same person*.

Thus, contrary to the majority's assertions, the statutory definition of "revolving charge agreement" does not require that only retail sellers may act as creditors under revolving charge agreements. The majority's interpretation is contradicted by other points as well. The majority's argument, in essence, is that because the definition of "revolving charge agreement" in RCW 63.14.010(10) incorporates the definition of "retail installment transaction", only retail sellers may enter into revolving charge agreements. This interpretation is contradicted by the point that the definition of "[l]ender credit card agreement" in RCW 63.14.010(3) also incorporates the definition of retail installment transactions. One cannot infer from this that only retail sellers may enter into lender credit card agreements.[4] Indeed, the issuer of a lender credit card agreement *may not* be principally a retail seller. RCW 63.14.010(3).

The majority attempts to address this deficiency in its position by underscoring the fact that RCW 63.14.010(3) specifically authorizes the third party creditor's purchase, with

---

[4]A lender credit card agreement is defined as an agreement "prescribing the terms of retail installment transactions pursuant to which the issuer may, with the buyer's consent, purchase or acquire one or more retail sellers' indebtedness of the buyer under a sales slip or memorandum evidencing the purchase, lease, loan, or otherwise to be paid in accordance with the agreement." RCW 63.14-.010(3).

the buyer's consent, of the buyer's indebtedness to the retail seller. Majority opinion, at 311. The majority regards this as showing that when the Legislature intended that a third party creditor be involved, it so provided. This argument misses the point, which is that the majority's reasoning relative to the statutory definition of "revolving charge agreement" leads to a manifestly false conclusion when applied to the corresponding definition of "lender credit card agreement". Moreover, the majority's argument reduces to the proposition that because the definition of "revolving charge agreement" does not explicitly allow that the creditor may be someone other than the retail seller, it follows that only retail sellers may act as creditors; in short, what is not allowed is forbidden. The contrary view seems to me more appropriate. The statute does not prohibit nonretail sellers from providing financing under revolving charge agreements; ergo, they are permitted to enter into such agreements.

There is a further problem with the majority's position. Prior to 1967, RCW 63.14.180 provided that "[a]ny *seller* who enters into any contract or agreement which does not comply with the provisions of this chapter or who violates any provision of this chapter except as a result of an accidental or bona fide error" shall be barred from the recovery of fees under the agreement. (Italics mine.) Former RCW 63.14.180.[5] The Legislature amended the quoted phrase in 1967 by, *inter alia*, replacing the word "seller" with the word "person". Laws of 1967, ch. 234, § 10. I see no other way to interpret this amendment than as indicating the Legislature's intention that persons other than retail sellers may enter into retail installment contracts or revolving charge agreements. It is noteworthy that the Washington State Attorney General interpreted the significance of the 1967 amendment in this way in a 1968 opinion. AGO 6, at 5, 9 (1968) (addressing whether RISA applied to bank card purchases). The majority fails to consider the 1967 amendment.

---

[5]References to lender credit card agreements, such as appear in the present statute, were added in 1984. Laws of 1984, ch. 280, § 12.

It is an important point, however, and one that squarely contradicts the majority's position.

The majority purports to state an "alternate ground" on which its holding is based. The majority rests this "alternate ground" on the premise that RCW 63.14.010(10) defines a revolving charge agreement in the singular as one financing agreement applying to many retail installment transactions. Majority opinion, at 311. The majority reasons that because of this, Whirlpool would have had to have been a party to the original agreement executed by the Crosslers, which it was not since it received the agreement by assignment from Enterprize Mart. Majority opinion, at 312. In fact, if one looks past the form of the original transaction and considers its substance, Whirlpool clearly was a party to the original transaction because it was in reality Whirlpool, not Enterprize Mart, that was extending the credit to the Crosslers. Ignoring this, however, and adopting the fiction that Enterprize Mart was really the original creditor and Whirlpool received the agreement by assignment, there is no reason to regard this as inconsistent with the fact that RCW 63.14.010(10) defines "revolving charge agreement" in the singular. "An assignment does not change the scope of the contract or agreement on which it is based." *Walton v. Severson*, 100 Wn.2d 446, 455, 670 P.2d 639 (1983). Rather, an assignment of full title and interest places the assignee in the shoes of the assignor, giving the assignee whatever rights the assignee had under the agreement. *Walton*, at 455. Therefore, the assignment from Enterprize Mart to Whirlpool simply placed Whirlpool in Enterprize Mart's shoes. The agreement remained the same. Repeat transactions made possible by the agreement were no less possible under that same agreement once it had been assigned to Whirlpool.

As regards the Zachmans' agreement, the majority asserts that it is consistent with the definition of a lender credit card agreement and inconsistent with the definition of a revolving charge agreement because it made Whirlpool's extension of credit to the Zachmans contingent upon Whirlpool's

approval. Majority opinion, at 312. It may be that the Whirlpool agreement is consistent in some respects with the statutory definition of a lender credit card agreement, but that in itself is no reason not to regard it as also consistent with the statutory definition of a revolving charge agreement. The majority's concern over Whirlpool retaining the right to approve future extensions of credit is also unfounded. A creditor may reasonably condition future extensions of credit upon approval in order to enable itself to confirm on those future occasions that the borrower is staying within the originally agreed upon credit limit and maintaining a satisfactory credit history. Requiring such approval is fully compatible with an agreement being a revolving charge agreement. There is evidence in the present case that Whirlpool's right to approve future credit amounted to nothing more than such routine credit checking. For example, the Zachmans' attorneys' secretary stated in a memorandum for her employer's file that she had entered into a revolving charge agreement with Whirlpool, and that she had made a second purchase under her Whirlpool account after giving the retailer only her name, address, and Social Security number. She said the retailer simply called Whirlpool on the telephone and received an authorization number. Unrebutted evidence such as this in the record establishes that subsequent purchases under Whirlpool revolving charge agreements are both common and routine.

Finally, I comment upon the majority's scholarly but anachronistic discussion of the history of installment sales regulation. Quoting mostly commentators writing in the 1950's and 1960's, the majority argues that, historically, major appliances were commonly purchased using retail installment contracts. Majority opinion, at 308-10. Although the majority does not make this explicit, it appears the majority intends to predispose us to view the Whirlpool agreements as retail installment contracts because they were used to make purchases of household appliances. It is no doubt true that in 1963, when RISA was enacted, major appliances

were widely regarded as suitably purchased under retail installment contracts rather than revolving charge agreements. The way retail installment contracts and revolving charge accounts were used 30 years ago, however, should not limit the ways in which they may be used today.

In summary, I see no positive basis for the majority's view that the Whirlpool agreements are not revolving charge agreements, a view which is directly contradicted by the 1967 amendment to RCW 63.14.180. I therefore must respectfully dissent.

Because the trial court's grant of summary judgment against Whirlpool was based on its acceptance of the erroneous view that only retail sellers may enter into revolving charge agreements, and because there is no genuine issue as to any relevant material fact, I would remand the case and order the trial court to dismiss all of the plaintiffs' claims which depend on that assertion. Whatever claims the plaintiffs have raised which do not depend upon that assertion have not been the subject of this appeal and could be addressed by the trial court upon remand.

DOLLIVER, J., concurs with GUY, J.